Paul A. REESE, Appellant,

v.

Stanley M. NELSON, John Ahlfeld, Benjamin F. Weaver, John B. Rengier, Nelvin L. Bitner, Raymond G. Herr, William E. Chillas, Esq., Charles B. Grove, Jr., Esq., Robert Reed, Frederick Plowfield, August J. Schulz, M.D., J. Albert Schulz, M.D., St. Joseph's Hospital.

No. 78–1654.

United States Court of Appeals,
Third Circuit.

Argued Feb. 20, 1979.

Decided May 2, 1979.

Samuel M. Mecum (argued), Glazier, Minney, Mecum & Kohr, Lancaster, Pa., for appellant.

Thomas E. Byrne (argued), Krusen, Evans & Byrne, Richard R. Galli, Philadelphia, Pa., for appellees Nelson, Ahlfeld, Weaver, Rengier, Herr, Grove and Plowfield.

John S. J. Brooks (argued), Brooks, Bradley & Kenney, Media, Pa., for appellee, August J. Schulz, M.D.

Before HUNTER and WEIS, Circuit Judges, and STAPLETON,* District Judge.

## OPINION OF THE COURT

WEIS, Circuit Judge.

A letter sent to a county official referring to a "well placed bomb" as a way of solving plaintiff's frustration with local government began a series of events leading to his emergency confinement for psychiatric evaluation. Alleging deprivation of constitutional rights, plaintiff brought suit against various officials who participated in the proceedings authorized by the Pennsylvania Mental Health and Mental Retardation Act of 1966. After reviewing the trial record, we conclude that the evidence indisputably establishes a qualified immunity for the defendants which required the entry of directed verdicts for them. Accordingly, we do not meet plaintiff's challenges to the jury instructions and affirm a judgment for the defendants.

Plaintiff Paul Reese was temporarily confined to the psychiatric ward of St. Joseph Hospital in Lancaster, Pennsylvania for examination pursuant to the Pennsylvania statute which authorized a limited commitment of a person whose mental condition made him a danger to himself or others. He was discharged after eight days, and later filed suit in the district court against various Lancaster County officials and the examining psychiatrist under 42 U.S.C. §§ 1983 and 1985. After a trial, a jury responding to interrogatories found that the defendant psychiatrist and county officials acted in good faith in utilizing legal process to bring the plaintiff to a hearing before a master in the state court. The district court then entered judgment for all the defendants.

Testimony established that on a number of occasions plaintiff sent abusive letters to local governmental officials, protesting what he conceived to be their unwarranted intrusions into citizens' private lives, particularly in the area of community planning. In a letter dated January 20, 1973, addressed to John Ahlfeld, Director of the Lancaster County Planning Commission, the plaintiff complained about "unAmerican collectivistic works" and wrote:

"Perhaps you will feel more secure by turning this letter over to the U.S. postal authorities. But I do not see how you can gain much in that direction. By following federal standards in our war against Communists (alleged, probable and even possible), a well placed bomb is the acceptable answer to the problem. And the record of your work identifies you!

More truly than you believe,
Paul A. Reese

P.S. Please be gone by July 1, 1973."

Plaintiff also sent letters to the county commissioners on June 1, 1973, and June 7, 1973, in which he stated that they were "courting disaster," that a judgment that plaintiff would "go away" would be no better than the Department of Defense's evaluation of the Viet Cong, that plaintiff was "beginning to feel like a trapped animal," and was "now desperately appealing for a 'cease and desist' from political oppression." Included with the June 1, 1973 letter was a copy of the one dated January 20 addressed to Ahlfeld. Another letter in similar tenor

---

* Honorable Walter K. Stapleton, United States District Court for the District of Delaware, sitting by designation.

was sent to Ahlfeld on June 13, 1973, stating in part: "[L]et it be known that you are the one who determines your own safety and happiness. . . . You are the one who has attacked and robbed me, and made it necessary for me to devise ways to defend myself." In early June, plaintiff appeared at Ahlfeld's office and engaged in an abusive tirade with the receptionist, stating that "I am the fellow who is going to get [Ahlfeld's] rear end if he is not gone by July 19,—or, by the July 1st."

On June 11, 1973, Ahlfeld met with defendant Stanley Nelson, the administrator of the county mental health and retardation program, who had some 17 years experience as a clinical psychiatric nurse in addition to post-graduate training in the field. After reading the letters sent by plaintiff, Nelson and Benjamin Weaver, the county administrator, visited Reese's home and talked to him and his wife. In the course of the conversation, Reese was asked to explain the letter of January 20, 1973 and replied that "the letter states exactly what appears in it." When the two men told plaintiff that Ahlfeld was anxious about his safety,

plaintiff stated, "If I were doing the things Mr. Ahlfeld was doing, I would be concerned, too."

Becoming apprehensive about Reese's conversation and demeanor, Nelson decided to secure a court order for a psychiatric examination under § 406 of the Pennsylvania Mental Health and Mental Retardation Act, Pa.Stat.Ann. tit. 50, § 4406.[1] A hearing was scheduled for the morning of Friday, June 29, 1973, but plaintiff was not notified until about 8:00 A.M. that day, when two deputy sheriffs appeared at his home and escorted him to the courthouse.[2] A public defender was assigned to represent the plaintiff at the hearing which began soon after 9:00 A.M. The proceedings could not be concluded, however, because the assigned court reporter was required to attend a criminal trial at 10:00 A.M. and at that hour the hearing was continued.

Nelson and the county solicitor, John Rengier, were concerned about the plaintiff's apparent fixation on the upcoming July 1 date and decided to invoke the emergency commitment procedure of § 405, Pa. Stat.Ann. tit. 50, § 4405,[3] so that the plain-

1. Section 406 of the Act provided in pertinent part:

(a) Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis. (1) The petition may be made . . . by the executive officer or an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person. (2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician. (3) Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court; (ii) fix a date for a hearing which shall be as soon as the warrant is executed, and (iii) notify the parties in interest.

2. This abbreviated notice practice had been established by the presiding judge of the Lancas-

ter common pleas court in the belief that advance notice would exacerbate the condition of the person to be examined. There was testimony that experience in hearings provided support for this view.

3. Section 405 provided:

(a) Whenever a person appears, by reason of his acts or threatened acts, to be so mentally disabled as to be dangerous to himself or others and in need of immediate care, he may be taken into custody for the purpose of examination, provided that:
(1) Only a relative . . . or authorized agent of a governmental or recognized nonprofit agency providing health or welfare services, or a police officer may take such person into custody and then only upon written application approved by the administrator or his delegate, and
(2) The acts or threats which give cause to believe the person to be mentally disabled and in need of immediate care are overt, demonstrate a clear and present danger to self or others and are set forth in the application.
(b) Immediately upon being taken into custody, such person shall be taken with the approved application for examination to a physician or designated facility for examination

tiff could be examined immediately by a psychiatrist. The necessary documents were signed by defendant Raymond Herr, a county commissioner, and the plaintiff was taken to St. Joseph Hospital where he was examined shortly after noon by Dr. August Schulz, a psychiatrist.

Dr. Schulz determined that the plaintiff was potentially dangerous and should be detained for additional evaluation. After one week's observation in the hospital, the physician concluded that the plaintiff's paranoia was long-standing and that prolonged hospitalization was not indicated. He therefore released plaintiff and suggested treatment at an out-patient clinic.

The defendants named in the case were Stanley M. Nelson, the county health administrator, John Ahlfeld, the county planning director, John B. Rengier, the county solicitor who handled the hearing for the county, Raymond G. Herr, the county commissioner who signed the application for the § 405 commitment, Charles B. Grove, Jr., the solicitor for the planning commission, Frederick Plowfield, the county sheriff, whose deputies brought plaintiff to the hearing, and Dr. August J. Schulz, the psychiatrist who first examined the plaintiff on June 29, 1973.[4] All defendants moved for judgment at the conclusion of the plaintiff's case and after all the evidence had been submitted. The motions were denied and the case was submitted to the jury on a single interrogatory as to each defendant.[5]

The plaintiff contends that the trial judge erroneously failed to instruct the jury that the defendants had the burden of proving good faith,[6] failed to properly define the scope of that defense and committed other errors in the charge. We do not find it necessary to meet these contentions because, viewing all the evidence favorably to the plaintiff, the trial judge should nevertheless have directed verdicts for the defendants. Consequently, the alleged errors in the charge are not material.

Plaintiffs conceded throughout the case and on appeal that the defendants were entitled to a conditional or qualified immunity as set out in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). We therefore examine the evidence to determine if there was any conflict in testimony which had to be resolved by the jury or if the record in the case failed to establish good faith. We conclude that both inquiries must be answered in the negative.

Although as a general proposition, the question of the qualified immunity of a state official is a matter for factual resolution, *see Scheuer v. Rhodes, supra,* at 242–43, 249–50, 94 S.Ct. 1683; *Fidtler v. Rundle,* 497 F.2d 794, 801–02 (3d Cir. 1974), it is clear the issue need not always be a jury question. In *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court affirmed the entry of a summary judgment on the basis of a quali-

---

on an emergency basis: . . . (ii) When the examination is made at a designated facility and it is determined by an examining physician that the person is in need of immediate emergency care, the examining physician shall file the required certificate and the commitment of such person for emergency care thereby shall be effected.

. . . .

(f) Any person committed under this section may be detained for a period of not more than ten days. . .

4. Other named defendants were dismissed at earlier stages in the litigation.

5. Each interrogatory was in the following form with an individual defendant's name inserted:

"Did [defendant's name] act in good faith when he aided in effecting a legal process whereby Paul Reese was brought before a Master of the Court of Common Pleas of Lancaster County for hearing?"

The interrogatory addressing Dr. Schulz's involvement inquired:

"Did August J. Schulz, M.D., act in good faith when he exercised his power to confine Paul Reese?"

6. In *Skehan v. Board of Trustees,* 538 F.2d 53, 59–62 (3d Cir.) (en banc), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976), *on remand,* 431 F.Supp. 1379 (M.D.Pa.1977), *aff'd in relevant part,* 590 F.2d 470 (3d Cir. 1978), we held that defendants had the burden of proving good faith in a claim of qualified immunity.

fied immunity. Similarly, in *Princeton Community Phone Book, Inc. v. Bate,* 582 F.2d 706, 715 (3d Cir. 1978), we affirmed a summary judgment in favor of defendants in a § 1983 damage claim on the basis of uncontradicted depositions and affidavits establishing good faith. In this case, by way of contrast, we have the benefit of all the evidence submitted at a ten-day trial.

■ In evaluating the good faith defense, moreover, it need not be necessary to determine whether the defendants' conduct did in fact violate the plaintiff's constitutional rights or whether the procedures utilized by Lancaster County were constitutionally deficient. As *Navarette* makes clear, the immunity defense should not be rejected if at the time that the act was committed there was no clearly established constitutional right and there was no malicious intention to deprive the plaintiff of a constitutional right or cause him other injury. 434 U.S. at 562, 98 S.Ct. 855.

■ We consider first the issue of whether there was a clearly established constitutional right which should have been apparent to the defendants. Restriction of the freedom of the mentally ill when necessary to prevent danger to themselves and to others is a recognized and constitutional function of the state. *See, e.g., O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Coll v. Hyland,* 411 F.Supp. 905 (D.N.J.1976) (per curiam); *see generally Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L. Rev. 1190 (1974). The procedures leading to the determination of facts justifying confinement, however, are subject to the constitutional limitations of due process. *See O'Connor v. Donaldson, supra,* at 580, 95 S.Ct. 2486 (Burger, C. J., concurring); *Bartley v. Kremens,* 402 F.Supp. 1039, 1045–54 (E.D.Pa.1975), *vacated on other grounds,*

431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), *on remand sub nom. Institutionalized Juveniles v. Secretary of Public Welfare,* 459 F.Supp. 30 (E.D.Pa.1978), *probable jurisdiction noted,* 437 U.S. 902, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978); *Dixon v. Attorney General,* 325 F.Supp. 966 (M.D.Pa. 1971); *cf. Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

Plaintiff here contends that due process required notice of the proceeding, opportunity to be heard, representation by counsel, and the right to cross-examine witnesses. Assuming for the moment that such procedures were established as constitutional requirements in 1973 with respect to court-ordered nonemergency commitments—an assumption which, incidentally, is by no means clear—the fact remains that the confinement of the plaintiff resulted from the invocation of § 405, the emergency provisions of the statute. Section 405 provided that a person could be taken into custody and examined by a physician in an emergency on the petition of certain designated persons. It applied when a person was so mentally disabled as to be dangerous to himself or others and the acts giving rise to that belief were overt and demonstrated a clear and present danger. No person could be confined under the act for more than ten days.[7]

■ There is no evidence nor indeed any contention by plaintiff that in 1973 this section of the statute was considered clearly unconstitutional. No United States Supreme Court decision had passed upon emergency commitment procedures at that point and the two leading three-judge district court cases on the subject were in disagreement. In *Logan v. Arafeh,* 346 F.Supp. 1265 (D.Conn.1972), *aff'd mem. sub nom. Briggs v. Arafeh,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973), the court

---

7. In 1976, the Pennsylvania legislature enacted the Mental Health Procedures Act, Pa.Stat. Ann. tit. 50, §§ 7101–7503 (Purdon Supp.1978–1979), responding to procedural inadequacies found in the 1966 Act. The emergency provisions of the present statute impose a clear and present danger test and require that an examination must take place within two hours after the patient is taken to a mental health facility. The initial detention period cannot exceed seventy-two hours. *Id.* §§ 7301–7302. *See generally* Comment, Pennsylvania's Mental Health Procedures Act, 15 Duq.L.Rev. 669, 676–79 (1977); Note, Standards for Involuntary Civil Commitment in Pennsylvania, 38 U.Pitt.L.Rev. 535, 543–44 (1977).

turned back a constitutional challenge to a state statute which allowed an emergency commitment for not more than 15 days without prior notice and hearing. That statute required as a prerequisite to the commitment, certification by a physician that the patient was a danger to himself or others as a result of mental illness. On the other hand, *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972), *vacated and remanded on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *on remand,* 379 F.Supp. 1376 (E.D.Wis.1974), *vacated and remanded on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), decided that a preliminary hearing should be held within 48 hours after a person was detained.

The only challenge to the Pennsylvania Mental Health and Mental Retardation Act prior to 1973 was *Dixon v. Attorney General, supra,* where a three-judge court found § 404 provisions, pertaining to the transfer of the criminally insane, unconstitutional. The opinion in that case, however, did not address § 405, nor did it even intimate peripherally any views with respect to the emergency commitment procedures.

We need not and should not consider by hindsight whether § 405 was infirm because unquestionably it was not clearly perceived to be deficient as of 1973 when the events here took place. The first or objective prong of the *Wood v. Strickland* test, inquiring whether defendants acted with such disregard for the established law that their conduct "cannot reasonably be characterized as being in good faith," therefore, has been met. *Procunier v. Navarette, supra* at 562, 98 S.Ct. at 860.

We come then to the second branch of the good faith test, the subjective inquiry directed at determining whether the officials acted with malicious intent. Again, the record requires a finding that no such intent existed.

The testimony in this case is unique in that there is no dispute about the material facts. Plaintiff admits that he sent the threatening letters and never told any of the defendants before the hearing that he meant no harm. In fact, at the meeting of the plaintiff, Weaver, and Nelson in the middle of June, plaintiff reiterated his position, stating that the letter of January 20, 1973 meant what it said. Plaintiff also admitted that he had a confrontation with Ahlfeld's receptionist and at that time had repeated his demand that Ahlfeld leave before July 1, 1973. Plaintiff's own testimony, therefore, establishes that the defendants had reason to believe that he was serious about his threats and that they were not merely harmless hyperbole. In addition, Ahlfeld and the receptionist both related their fear and that of other employees that a bomb might be used by Reese.

Nelson stated that after he had examined the letters and visited the Reese home in June, he believed that the plaintiff was on the verge of a serious emotional break. The tenor of the letters in his view had shifted from broad, general complaints about government to a focus on a specific department, person, time, and method for carrying out the threats. Moreover, according to Nelson's notes, when asked what he was going to do on July 1, plaintiff's attitude became more menacing and agitated. His response was that it made little difference whether one blew up one man in Lancaster County or killed a thousand men in Vietnam.

After the visit, Nelson's decision to apply for an examination under § 406 was approved by Rengier, the county solicitor, who agreed that it would be preferable to use that section's preliminary hearing procedure, although he felt that an emergency commitment would have been justified. As it turned out, however, the § 406 hearing could not be completed, leaving Nelson and the solicitor in a quandary. As Nelson explained it, the level of frustration that plaintiff had demonstrated two weeks earlier and the imminence of the July 1 date then only two days away, triggered serious concern for his safety as well as that of employees of the planning commission. In Nelson's view, the matter had reached a critical point, and the only available safeguard was a § 405 commitment. Rengier

concurred in this decision, and after being advised of the circumstances, Commissioner Herr signed the appropriate petition.

This state of events does not demonstrate any malice on the part of Nelson, Rengier or Herr, the three officials who decided that it was necessary to implement the emergency procedures. There had been no personal relationship between them and the plaintiff and there is nothing in the record establishing animosity, or use of power to inflict harm for reasons unrelated to the performance of their duties. To the contrary, the concern expressed was that without emergency temporary detention for evaluation, serious harm might result. Since the other defendants, Ahlfeld, the sheriff, the planning board solicitor, and the psychiatrist, were not consulted and did not participate in the decision to use the § 405 procedure, no malice can be imputed to them.

In our view, the arrangements for the original § 406 proceeding were actually immaterial since it was not that hearing which resulted in the plaintiff's confinement. In any event, there is no evidence of bad faith tainting the commencement of the § 406 proceeding. The record clearly discloses that the actions of the defendants were prompted by interest in their own protection, that of co-employees, and concern for the safety of the plaintiff himself. There is no evidence of vindictiveness or intent to injure plaintiff. Indeed, that the county officials decided first to use the § 406 hearing procedure despite what they believed to be a danger of harm demonstrates, as was termed by Rengier, simply a reluctance to use the raw power available to them, rather than a lack of justification for an emergency examination.

Dr. Schulz's role in these matters was only that of an examining psychiatrist. He did not participate in the decision to institute commitment proceedings and had no responsibility for any of the alleged procedural deficiencies. See Beaumont v. Morgan, 427 F.2d 667 (1st Cir.), cert. denied, 400 U.S. 882, 91 S.Ct. 120, 27 L.Ed.2d 121 (1970). Nor was there any evidence that he had conspired with the defendants to detain plaintiff regardless of findings on his mental condition. The physician had not been acquainted with plaintiff before the examination and there is no evidentiary basis for inferring any inclination to injure the plaintiff.

After a painstaking review of all the testimony in this trial, we are convinced that the case should not have been submitted to the jury and that verdicts should have been directed for all defendants. We are deeply sensitive to the evils that could flow from an abuse of the commitment process, particularly when the patient is one who has espoused unpopular or antagonistic positions toward those in authority. But we are firmly convinced that no perversion of legal process occurred in the temporary commitment proceedings here and thus are persuaded that the defendants were entitled to findings of qualified immunity as a matter of law.[8]

Plaintiff raises other trial errors, including exclusion of expert testimony by a psychiatrist, and counsel complains of abusive treatment by the judge during the trial. We have reviewed the record of the entire trial and find no reversible error in these contentions.

The judgment of the district court will be affirmed.

---

**8.** Plaintiff takes the position that each of the defendants was entitled to a qualified immunity from damage liability and therefore we do not take this occasion to meet the question whether every governmental employee in a § 1983 action is entitled to assert the defense of good faith, see Procunier v. Navarette, supra at 568–69, 98 S.Ct. 855 (Stevens, J., dissenting). Thus we need not enter into an analysis determining whether the sphere of official responsibility, the degree of discretion authorized, and the existence of common law immunity accorded a particular official affect the scope of the defense available to each of the defendants. Compare Imbler v. Pachtman, 424 U.S. 409, 421–24, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and Wood v. Strickland, supra at 322, 95 S.Ct. 992, and Scheuer v. Rhodes, supra at 238–47, 94 S.Ct. 1683, with O'Connor v. Donaldson, supra, and Procunier v. Navarette, supra. See Developments in the Law—Section 1983, 90 Harv.L.Rev. 1133, 1210–15 (1977).