Frank "X" ST. CLAIRE

v.

Julius CUYLER et al.

Civ. A. No. 78–4134.

United States District Court, E. D. Pennsylvania.

Nov. 29, 1979.

Edward A. Tiryak, Community Legal Services, Philadelphia, Pa., for plaintiff.

Mark N. Cohen, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Plaintiff Frank "X" St. Claire, presently and during the relevant time period, November 1976 to December 1977, an inmate at the State Correctional Institution at Graterford, Pennsylvania (Graterford), has brought this civil rights action asking for declaratory, injunctive and damage relief for the alleged infringement of his First and Fourteenth Amendment rights of free exercise of his religion. The action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution; and 28 U.S.C. §§ 2201 and 2202 providing for declaratory and injunctive relief. Jurisdiction is founded upon 28 U.S.C. § 1343.

The defendants are Julius Cuyler, who is, and at all times relevant was, the superintendent of the State Correctional Institution at Graterford; William I. Walker, D. C. Wampole, John Burroughs, and R. H. Spaid, all correctional officers at Graterford; Martin Dragovich, corrections counselor and acting case work supervisor during the relevant period, and James Thrash, maintenance superintendent.

## I. FINDINGS OF FACT:

In 1968 the plaintiff joined the Nation of Islam and in 1973 changed his affiliation to the Ahmadiyya branch of Islam. He is presently a practicing Muslim and believes in the tenets of the Muslim faith as follows: (1) there is no God but Allah and Mohammed is his messenger; (2) plaintiff should observe prayer at least five times a day; (3) he should pay zakat (contributions for charity); (4) he should fast during the holy month of Ramadan; and (5) he should make a pilgrimage to Mecca at least one time during his life.

The plaintiff also believes that he should, whenever and wherever possible, and especially while praying, wear a kufi, which is a small round hat and which to the plaintiff indicates piety, humbleness, humility, neatness and devotion. Wearing the kufi is not mandatory, but is customary, and plaintiff believes it brings him closer to his God. It is also an insignia of the particular Islamic group to which he belongs. In addition, plaintiff's religion mandates attendance as often as possible but at least once a month at the congregational service known as Jumuah on Friday. A group of Muslims praying in concert is called Jumuah, and Jumuah prayer on Fridays provides twenty times more blessings than prayer performed alone.

On three specific occasions, occurring in December 1976, July and September 1977, plaintiff alleges his free exercise rights were infringed. From December 1976 through September 1977 plaintiff resided at times in a general population unit, in a segregated unit called "B" gallery and in the Behavioral Adjustment Unit (BAU), now known as the Restricted Housing Unit (RHU). Although both B gallery and RHU are segregated units, inmates on B gallery have more privileges than those in RHU; they are allowed out of their cells for breakfast, lunch, dinner, yard recreation, and for showers; on RHU inmates are allowed out of their cells only once a day.

On December 10, 1976, plaintiff, confined to B gallery, was wearing his kufi when he entered the B gallery dining room at mealtime. Although Superintendent Cuyler testified that there is a prison rule that no hats are allowed in the dining room, defendants have not shown that there is now, or ever has been, any written rule, regulation or directive prohibiting the wearing of headgear in the dining room.[1] Officer Walker ordered plaintiff to remove the prayer hat despite the fact that plaintiff stated that it had religious significance for him and that he wished to continue to wear it. Although distressed and angered, since he believed his religious rights to have been infringed, plaintiff claims he removed the kufi[2] and replaced it as he was leaving the

1. As of June 12, 1973, Administrative Directive BC–ADM 807 on Resident Grooming was amended to permit inmates to wear hairpieces. No exception was made for dining room wear. Plaintiff's Exhibit P–9.

2. Plaintiff's Exhibit P–1 (and Defendants' Exhibit D–4) is the Misconduct Report by defendant Officer Burroughs initialed by Officer Walker. It states that plaintiff refused to remove his kufi when told to do so. Attached to the Misconduct Report is the Inmate's Version in which plaintiff states he removed the hat and only replaced it on his head when carrying his tray from the dining area. It is not necessary to resolve this factual dispute inasmuch as plaintiff's claim is that the very order demanding he remove the kufi was an unconstitutional violation of his free exercise rights.

In defendants' post-trial memorandum it is argued that there were two Walkers who were officers at Graterford in December, 1976, and that defendant William Walker, a captain, was not the officer involved in the December 10, 1976 event. I reject defendant's contention. In ¶ 10 of the amended complaint, document No. 4, plaintiff alleges that defendants Walker and Burroughs ordered plaintiff to remove his kufi. At the time the answer was filed, January 30, 1979, document No. 7, defendant Walker had not been served. And in ¶ 5 of the answer, defendants claimed insufficient information to form a belief as to the truth of the allegations pertaining to Walker. On February 27, 1979, the Attorney General entered an appearance for William Walker, document No. 10, and in its answer for Walker, document No. 11, incorporated by reference the original answer, which in ¶ 10 admitted the allegations of ¶ 10 of the amended complaint, to wit, that defendants Walker and Burroughs ordered the plaintiff to remove his kufi on December 10, 1976.

In addition, defendants argue that plaintiff testified that the Walker in question was a correctional officer and not a captain and thus by his own words shows defendant Walker was not

area. Defendant Officer Burroughs, also in the dining area, told plaintiff he was guilty of a misconduct for wearing the kufi and refusing to obey an order. As a result of the misconduct, plaintiff was transferred back to the BAU to serve the remainder of a term there for a previous infraction that was to have expired December 17, and for which plaintiff had been released early. Following a December 13 hearing on the misconduct, plaintiff was returned to BAU until December 17 and given ninety days probation effective December 13, 1976, expiring on March 13, 1977. The hearing was conducted by Officers Dragovich, Spaid and Thrash. On December 17, 1976, plaintiff was transferred out of the BAU to the general population on C block and was assigned to kitchen duty.

The second incident, also involving a prayer hat, occurred on September 14, 1977, when plaintiff had an appointment to meet with the Parole Board. Attending the Parole Board involved going beyond the security gate in the main corridor, where, according to Superintendent Cuyler, prisoners are not allowed to wear "civilian" clothes.[3] On the date of his scheduled visit to the Parole Board, plaintiff was wearing a turban made from a bedsheet wrapped around his head. The turban is another form of religious head covering similar in purpose to the kufi, and has for the plaintiff and other members of the Muslim faith religious significance. At the security gate defendant Officer Wampole would not permit the plaintiff to attend the Parole Board hearing unless he removed his turban. For religious reasons plaintiff refused and was forced to forfeit his chance to meet with the Board. In a September 20, 1977 report the Parole Board rendered the following decision: "refuse Parole with prejudice; negative interest in parole. Will review when you request consideration." Plaintiff's Exhibit P–3.

The third incident occurred on July 20, 1977, when plaintiff was in administrative segregation on B gallery. On that date plaintiff made a formal written request to be permitted to attend Jumuah services on Friday afternoon in accordance with his religious beliefs. Plaintiff's Exhibit P–4. Superintendent Cuyler denied the request and advised plaintiff that he would be allowed to attend religious services only after his release from segregation. Plaintiff's Exhibit P–5.

As a matter of policy, allegedly never varied, inmates on B gallery or in RHU are not permitted to attend religious services while in segregation regardless of the nature of their offense. In addition the prison authorities make no determination as to whether or not a particular inmate is a potential troublemaker, or indeed whether there is any reason at all for excluding him from religious services other than his residence in a segregated unit. In this respect, there is no evidence on the record to show that Muslim prisoners are treated any differently from members of other religious faiths.

## II. DISCUSSION AND CONCLUSIONS OF LAW:

Plaintiff claims that the unwritten rule prohibiting the wearing of religious hats in the dining area, the refusal to permit him to wear a kufi or turban to a Parole Board hearing, and the denial of chapel privileges to inmates in segregated units all impermissibly interfere with the free exercise of his First and Fourteenth Amendment rights to practice his religion.

It is undisputed that a prisoner is not stripped of all constitutional rights merely by virtue of incarceration. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). In particular, the First Amendment prohibition

---

the Walker involved in the December 10, 1976 incident. This argument carries little weight, since prisoners cannot be held to accurate knowledge of prison staff titles.

3. Superintendent Cuyler, on cross-examination, acknowledged that prisoners working outside the prison security gates on the prison farm are permitted to wear headgear. He stated that they "circumvented" the gate, thus circumventing the regulation in question.

against governmental interference with the free exercise of religion, applicable to the states by reason of the Fourteenth Amendment, *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), protects state prisoners from penalty for the exercise of their religious beliefs. *Pell v. Procunier, supra; Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam). It is, however, equally well established that a prisoner retains his or her First Amendment rights only insofar as their exercise is not inconsistent with the needs and objectives of the prison. In this light, great deference is accorded the judgments of prison authorities, particularly with regard to the fundamental institutional concerns of security, order, and rehabilitation. *Bell v. Wolfish, supra; Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

## A. Threshold Requirements

■ For a prisoner to make out a First Amendment free exercise claim certain threshold requirements must be met: first, that a bona fide religion is involved; second, that at issue is a practice that is a tenet or custom of that religion; third, that the plaintiff is a sincere believer. *E. g., Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975). In this case, I find that all three are met. The first point is not disputed.[4] Graterford Prison authorities recognize Islam as one of the major established religions, have a chapel for Muslim worship and provide Muslim religious advisors when requested to minister to inmates' religious needs.[5]

■ I find that wearing a head covering and attending Jumuah services are tenets, or common practices, of the Ahmadiyya sect of Islam. It is not the province of the court to determine what constitutes religious orthodoxy, and thus a court need not find a practice to be mandated by a religion for it to be protected. Further, individuals relate to their religious practices and their Gods in different ways. So long as no idiosyncratic religious claims are made, particular to the individual asserting the right to the practice, the court is bound only to assess the sincerity of the believer and not the significance of the belief. *Cf. Burgin v. Henderson,* 536 F.2d 501, 503 n.4 (2d Cir. 1976); *Teterud v. Burns, supra,* 522 F.2d at 360; *Wright v. Raines,* 457 F.Supp. 1082, 1085 (D.Kan.1978); *Moskowitz v. Wilkinson, supra,* 432 F.Supp. at 949; *Monroe v. Bombard,* 422 F.Supp. 211, 215 n.4 (S.D.N.Y. 1976). In this inquiry, I find plaintiff is a sincere believer of the Ahmadiyya sect. Indeed, plaintiff demonstrated the depth of his religious commitment by forgoing a chance to meet with the Parole Board rather than remove his head covering.[6]

## B. The Applicable Legal Test

■ It is clear that outside prison walls free exercise rights are accorded great protection. Only governmental "interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). Thus, where prisoners are not involved, the state must demonstrate a compelling interest and means necessary, not merely reasonably related, to its effectuation.

4. Thus this case does not present the problem of whether an alleged religion is to be deemed such for First Amendment purposes; that is, Islam is not an "ad hoc [religion] concocted to obtain prison privileges." *Moskowitz v. Wilkinson,* 432 F.Supp. 947, 950 n.5 (D.Conn. 1977); *Kennedy v. Meacham,* 540 F.2d 1057 (10th Cir. 1976) (court addresses free exercise claims of prison adherents of a Satanic religion).

5. Muslim leaders are hired by the prison on purchase service contracts, whereas the institution has Catholic and Protestant clergy on staff. This difference, however, is not at issue in this case.

6. Correctional Officer Burroughs testified that in August and September of 1979 he saw plaintiff "quite a few times" without his kufi. On rebuttal, however, plaintiff established that in June of 1979, when he returned to Graterford, he was not permitted to bring his kufi with him into the prison, and was forced to borrow one. I find plaintiff's answer satisfactory and reject defendants' challenge to the sincerity of plaintiff's professed beliefs.

In *Procunier v. Martinez, supra,* a First Amendment but not a free exercise case, the Supreme Court held that prison authorities must show that a prison regulation furthers "an important or substantial governmental interest" and that the infringement on First Amendment rights must be "necessary or essential" to the protection of the governmental interest. "Thus," the court held, "a restriction . . . that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad." 416 U.S. at 413–14, 94 S.Ct. at 1181.[7]

The Third Circuit standard has evolved through a series of prison cases. Denominated a "reasonableness" test, *O'Malley v. Brierley,* 477 F.2d 785 (3d Cir. 1973), the court has held that in particular in cases alleging religious discrimination, it will intervene when "prison officials have *unreasonably* attempted to curtail the practice of religion by prison inmates." *Gittlemacker v. Prasse,* 428 F.2d 1, 4 (3d Cir. 1970) (emphasis added). A year later in *United States ex rel. Jones v. Rundle,* the court held that when religious freedoms are restricted, "the Government must show compelling justification for such deprivations" and observed that rights may be reasonably restricted to further the state interest. 453 F.2d 147, 150 (3d Cir. 1971). Finally, in its most recent opinion on free exercise rights of prisoners, the court in *O'Malley, supra,* again held that the state cannot impose an "unreasonable barrier" to free exercise rights, and then clarified the meaning of "reasonable" as follows: "the fact finder

shall find the regulation to be reasonable only if the alternative chosen (complete exclusion) resulted in the least possible 'regulation' of the constitutional right consistent with the maintenance of prison discipline." 477 F.2d at 796. "[L]east possible 'regulation' " can only mean that no lesser regulation is available. In other words, the regulation adopted was necessary and not merely reasonable. We must conclude that the Third Circuit, although speaking in terms of reasonableness, actually applies a test of necessity.

Although this "necessary means" approach is usually used in connection with a compelling state interest test, *see Harold X v. Brierley,* 457 F.Supp. 350, 356 (E.D.Pa. 1978), it has also been held a part of a substantial interest test, *Procunier v. Martinez, supra,* 416 U.S. at 413–14, 94 S.Ct. 1800. In *O'Malley, supra,* the Third Circuit rejected the "clear and present danger" standard as a requisite state interest, noting that the phrase was used in *Long v. Parker,* 390 F.2d 816 (3d Cir. 1968) in a typical First Amendment case involving the distribution of literature, albeit religious. The substantial nature of the governmental interest, however, in *O'Malley, supra,* was not at issue: the prison authorities had prohibited two priests from entering and conducting religious services inside the prison, having concluded that their presence and activities constituted an incitement to riot.[8] In light of the "compelling interest" language in *United States ex rel. Jones, supra,* it would seem that the Third Circuit at a minimum adheres to the *Procunier v. Martinez* test requiring a substantial or im-

7. Although the Supreme Court has not determined what test is applicable in a prisoner's religious freedom case, it is not unreasonable to assume that the *Procunier v. Martinez* test would be applied. It should be noted, however, that the Court has not foreclosed use of a compelling state interest test. It has rejected the compelling state interest test in *Bell v. Wolfish,* not a free exercise case, in which Justice Rehnquist writing for the Court held that the right at issue, the "presumption of innocence" did not support a compelling state interest rule. Neither, he concluded, did a due

process claim: "that clause provides no basis for application of a compelling necessity standard to conditions of pretrial confinement that *are not alleged to infringe any other, more specific guarantee of the Constitution.*" 441 U.S. 521, 533, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447, 465 (emphasis added).

8. The restrictions were imposed on the priests during the time period of the Attica prison rebellion in New York State, when prison authorities in Pennsylvania feared a similar disturbance at Western Penitentiary.

portant governmental interest and the least restrictive means to effectuate it.[9]

### C. The Challenged Regulations
### Prohibition of Religious Hats

█ The burden is on the prison authorities to show a substantial and important interest for the rule prohibiting the wearing of religious hats in the dining area, and to demonstrate that a total ban is the alternative least restrictive of prisoners' religious rights. The state has not sustained its burden.

Superintendent Cuyler and Robert Mauger, Deputy Superintendent of operations concerned with security, both testified that rules of "decorum" and security needs warranted the ban. With regard to decorum, Deputy Superintendent Mauger explained that if the prison allowed kufis in the dining room, prisoners might wear outside hats that are "sweaty" and dirty. In addition, he explained that it is "not polite" to eat with a hat on. He acknowledged that a dress code purpose had no security underpinnings.

With regard to security, both Superintendent Cuyler and Deputy Superintendent Mauger testified that prisoners can conceal lock picks, bullets, narcotics, money, and other contraband in their hats, and that hats can be used as insignias of identification. Notwithstanding these dangers, prisoners are permitted to wear headgear at the farm, gym, movies, chapel, commissary, school, exercise yard, and generally throughout the prison after 6:00 P.M.[10] Approximately 370 inmates are in the dining room at each sitting. By contrast, in the yard at the recreation period approximately 1300 inmates congregate at a given time. Surely inmates in the yard or in the other areas where hats are permitted, could as easily conceal contraband as in the dining room.[11] When asked directly why there was a prohibition against the wearing of religious hats in the dining room, but not, for example, in the yard, Deputy Superintendent Mauger answered, "It's the rule." Quite obviously that explanation does not satisfy the requirement of a substantial or important state interest.

Another reason advanced by Superintendent Cuyler for the prohibition against religious hats in the dining area, was that if some inmates were allowed to wear hats, many would demand the right, thus multiplying the security problems of the prison administrators. It is true that even if an alleged security risk alone might not be sufficient to constitute a substantial or important reason for impairment of a free exercise right, arguably if multiplied, the cumulative effect might indeed be sufficient to withstand a constitutional challenge. The burden, nonetheless, is on the government to show that this concern is based on more than mere speculation. *Abdullah v. Manson*, Civ.No. 15,606 (D.Conn. Mar. 13, 1973) (unpublished). When questioned on this point, defendant Mauger acknowledged that although prisoners in the yard are permitted to wear headgear (not restricted to religious hats), in the summer months very few of the nearly 1300 inmates gathered in this one area take advantage of, let alone abuse, the opportunity. Indeed, in the winter months the prison issues headgear to inmates for outdoor wear.[12]

---

**9.** The Second Circuit has followed a similar approach, *LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1972), *cert. denied*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973). *See also Burgin v. Henderson, supra.*

**10.** Although Superintendent Cuyler called the dining room a "hot spot" there was no evidence to support this assertion. Indeed, the prison requires inmates who work on the cafeteria line to wear hats that the prison issues to them for health reasons. Deputy Superintendent Mauger testified that although these hats are supposed to be returned at the end of duty, often many are not.

**11.** According to Deputy Superintendent Mauger, the shirts and pants that inmates wear to the dining area have pockets. A great deal less can be hidden under a kufi, which is a form-fitting skullcap, than in an average pant pocket.

**12.** Since only a small number of inmates in the yard wear hats for purposes other than protection from the weather, Deputy Superintendent Mauger stated that of the 370 inmates in the

Finally, the Supreme Court has held that "[w]hile not necessarily controlling the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction." *Procunier v. Martinez, supra,* 416 U.S. at 414 n.14, 94 S.Ct. at 1812 n.14; *Teterud v. Burns, supra,* 522 F.2d at 361 n.9; *Moskowitz v. Wilkinson, supra,* 432 F.Supp. at 950. Plaintiff's unchallenged testimony was that he was permitted to eat while wearing his kufi at the county prison at Holmesburg, at the Detention Center, at the House of Corrections in Philadelphia, and at Western State Penitentiary.

Although security concerns are by definition substantial and important, the mere assertion of a security interest can never be sufficient proof of its existence. *Cf. Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975) ("the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme."). On this record I find that the total prohibition of religious hats in the dining area to be based primarily on concerns of decorum and good manners, and has no substantial basis in any security needs.[13]

Even if the state had met its burden and demonstrated that in this instance the security interests at stake were substantial,

the *O'Malley* test requires a showing that means least restrictive of free exercise rights, yet consistent with security needs, have been chosen. *Supra,* 477 F.2d at 796. Clearly they have not here. Superintendent Cuyler testified that officers have great discretion in making decisions to search inmates. Spot checks of prisoners wearing religious hats in the dining area would not constitute an unreasonable burden on the smooth and safe functioning of the prison institution. *Cf. Teterud v. Burns, supra,* 522 F.2d at 361.[14] In addition, the prison authorities could reasonably determine the type of hats that might be worn consistent with security interest.[15]

The foregoing analysis applies as well to the restriction against inmates wearing religious hats to meetings with the Parole Board.[16] In fact, any routine search of hats would be even less burdensome than random dining room searches inasmuch as no more than one inmate at a time goes beyond the security gate.

### Chapel Attendance

The prison authorities assert that security and administrative needs underlie the rule prohibiting chapel attendance by a prisoner housed in a segregated unit. Prisoners are taken out of the general population and housed in segregated units for a

dining room, it is likely an even smaller number would want to wear hats.

**13.** In *Bell v. Wolfish,* the Supreme Court held that there must be "substantial evidence" showing that "officials have exaggerated their response" to considerations of security before regulations will be found unreasonable. 441 U.S. 520 at 541 n.23, 99 S.Ct. 1861, *quoting from Pell v. Procunier, supra,* 417 U.S. at 827, 94 S.Ct. 2800. This reasonableness test was applied in the context of a challenge to prison regulations based on the "presumption of innocence" and a procedural due process right. As such I conclude that this formulation is not applicable to the First Amendment free exercise challenge asserted in this case. It is also apparent to me that should this test be applied, the foregoing discussion makes clear that Graterford officials have indeed exaggerated their concerns about the security risks attendant on kufi wearing.

**14.** When applying the least restrictive means test, a number of courts have found unconstitutional prison regulations prohibiting inmates from growing beards for religious reasons. *Wright v. Raines, supra; Moskowitz v. Wilkinson, supra; Monroe v. Bombard, supra.*

**15.** A foot-high hollow hat obviously presents a greater security risk than the kufi skullcap. *Cf. Burgin v. Henderson, supra,* 536 F.2d at 504 (court held a factual record was necessary to determine "whether a rule barring all hats—of whatever size, style, or religious significance—is necessary to prevent hiding weapons."); *Abdullah v. Manson, supra.*

**16.** Defendant Wampole the officer on duty at the Day Captain's office in the main corridor on September 14, 1977, who refused to let plaintiff go to the Parole Board meeting wearing his turban, testified that he had no knowledge of any Parole Board policy forbidding the wearing of hats at Parole Board hearings.

variety of reasons, including punishment for infractions of prison regulations as well as protection of the prisoner segregated. In addition, the state claims that if segregated prisoners (there are 27 men in RHU and approximately 50 on B gallery) were allowed to attend chapel, each inmate would have to be accompanied by two escort guards, depleting the already small number of officers on duty within the prison compound, thus impairing security in general. Although segregated prisoners are escorted to see their attorneys, Superintendent Cuyler distinguished attorney visits from chapel attendance by stating that the prison is obligated by law to permit the attorney visits.[17]

Although financial constraints on prison administrators are relevant to a determination of reasonableness, they are not dispositive. *Battle v. Anderson,* 594 F.2d 786 (10th Cir. 1979); *Campbell v. McGruder,* 188 U.S.App.D.C. 258, 580 F.2d 521 (D.C.Cir. 1978); nor are " '[i]nadequate resources . . . . an adequate justification for the state's depriving any person of his constitutional rights.' " *Costello v. Wainwright,* 525 F.2d 1239, 1252 (5th Cir. 1976) [18] *citing with approval Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D.Ark.1971); *Detainees of Brooklyn House of Detention v. Malcolm,* 520 F.2d 392 (2d Cir. 1975).

In this instance, concerns of administrative feasibility are inextricably coupled with security considerations that are sufficient to meet the "substantial goal" burden. Nonetheless, as the court in *Barnett v. Rodgers* stated, "the mere fact that government, as a practical matter, stands a better chance of justifying a curtailment of fundamental liberties where prisoners are involved does not eliminate the need for reasons imperatively justifying the particular retraction of rights challenged at bar." 133 U.S.App.D.C. 296, 301–02, 410 F.2d 995,

1000–01 (D.C.Cir. 1969) (footnote omitted). Thus, the fact that the substantial interest test is met triggers the Third Circuit reasonableness requirement of the use of the least restrictive means to effectuate the state goal. In a leading Second Circuit case, the court upheld a prison ruling that a particular inmate while housed in a segregated unit could not attend religious services. *LaReau v. MacDougall,* 473 F.2d 974 (2d Cir. 1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973). *LaReau,* however, does not stand for the proposition that segregated prisoners as a routine matter may be denied chapel privileges. Indeed, the court there held to the contrary on the basis that "[n]ot all segregated prisoners are potential troublemakers: so some discrimination must be made by prison authorities among the inmates in the segregation unit." *Id.* at 979 n.9; proposition reaffirmed in *Mawhinney v. Henderson,* 542 F.2d 1 (2d Cir. 1976). Two other cases are routinely cited for the proposition that it is reasonable to deprive segregated inmates of chapel attendance privileges. Neither, however, should be read to have a broader holding than is justified by the facts. *Cf. Knuckles v. Prasse,* 302 F.Supp. 1036, 1053 (E.D.Pa.1969), *aff'd,* 435 F.2d 1255 (3d Cir. 1970), *cert. denied,* 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971). In *Sharp v. Sigler,* 408 F.2d 966 (8th Cir. 1969), the court held that under a reasonableness standard the prison properly prevented the four inmate plaintiffs, all of whom had violent histories while incarcerated, from attending chapel. Justice Blackmun, then Circuit Judge, who authored the opinion, observed that it would be constitutionally valid for prison authorities to permit some inmates and not others to attend chapel on the basis of behavior records. *Accord, Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D.Fla.1976). In *Sweet v. South Carolina Department of Corrections,* an inmate plaintiff had testi-

---

17. Of course that is the essence of plaintiff's claim regarding chapel attendance. At most this explanation supports Superintendent Cuyler's good faith defense against any damage claim, *i. e.,* he is not presently obligated by law to allow chapel attendance and therefore cannot be held to anticipate changes in the law for purposes of damage relief. *See, infra.*

18. *Rev'd on rehearing, on other grounds,* 539 F.2d 547 (5th Cir. 1976) (en banc), *rev'd,* 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 *reinstated on remand,* 553 F.2d 506 (5th Cir. 1977).

fied that he was in administrative segregation for his own protection, since his presence in the general population had nearly caused a riot. The court held, "[i]n that sort of an atmosphere it would seem foolhardy, if not downright gross negligence" for the authorities to allow the prisoner to attend chapel with the general population. 529 F.2d 854, 863 (4th Cir. 1975) (en banc).

In this case there is nothing on the record to show any violent infractions by plaintiff or that he is himself a violent, aggressive, or provocative person, or a trouble-maker in general. To the contrary, the evidence shows that the prison authorities considered St. Claire sufficiently trustworthy to assign him to kitchen employment on December 17, 1976, when he was returned to the general population. Defendants' Exhibit D–5.

It is not the proper function of the court to draw up a prison administration plan for chapel attendance. It is the court's province, however, to set forth guidelines delineating the constitutional perimeters of prison action. In this light, to fashion a restriction that is the least burdensome on the constitutional right asserted and still consistent with prison considerations of security and order, the prison authorities may embark on a two-tier analysis: first, assess whether a particular inmate is unruly or likely to cause security problems by his presence at chapel; then, if necessary, structure a staggered or rotating attendance schedule that would incorporate both the religious requirements of the inmates and the deployment-of-personnel concerns of the administration.

*III. REMEDIES:*

█ Plaintiff's prayer for damages is denied, since all the defendants have successfully asserted a good faith defense.[19] *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Reese v. Nelson*, 598 F.2d 822 (3d Cir. 1979). Under the *Wood v. Strick-*

*land* test, defendants must establish that there were reasonable grounds for their belief that they were acting in good faith and that they did not in fact act with malicious intent. At the time of defendants' actions in this case, prisoners had no clearly established constitutional rights under the law of this circuit to wear religious headgear at all times, or to attend religious services when housed in segregated units. That defendants' conduct did violate plaintiff's constitutional rights does not affect defendants' good faith defense. *Reese v. Nelson, supra* at 826. In addition, evidence in the record is undisputed that defendants did not believe they were violating plaintiff's constitutional rights nor were their actions motivated by spite, malice, or vindictiveness toward the plaintiff.

As for declaratory relief, I hold that the rule against all hats in the dining area or through the security gate is unconstitutional as applied to prisoners who wear hats because of sincerely held religious beliefs. An appropriate order will be entered in accordance with this opinion.

**ORDER**

AND NOW, this 29th day of November, 1979, it is hereby ORDERED as follows:

1. Defendants are enjoined from preventing plaintiff from wearing a kufi or other religious hat.

2. Defendants may conduct reasonably necessary inspections of religious headgear worn by the plaintiff for the purpose of determining the presence of any contraband of any kind.

3. Defendants shall notify the Pennsylvania Parole Board that the plaintiff failed to attend his September 1977 parole hearing because he obeyed a rule that has been determined to be unconstitutional.

4. Defendants shall permit the plaintiff to attend his religious services unless it is determined after full hearing, followed by appropriate findings of fact, that the plain-

---

**19.** Defendants have the burden of pleading and proving the good faith defense, *Skehan v. Board of Trustees of Bloomsburg St. College,* 538 F.2d 53 (3d Cir.) (en banc), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976).

tiff's attendance at religious services constitutes a threat to prison discipline or the prison population.

5. Defendants shall expunge from their records all references to Misconducts and disciplinary proceedings held because of the plaintiff's alleged refusal to remove religious headgear.

6. Defendants are not liable to the plaintiff for monetary damages.