**Richard WOJTCZAK, Plaintiff,**

v.

**Julius T. CUYLER, Individually and in his official capacity as Superintendent at the State Correctional Institution at Graterford et al., Defendants.**

Civ. A. No. 76–3087.

United States District Court, E. D. Pennsylvania.

Dec. 6, 1979.

As Amended Dec. 21, 1979.

---

Edmond A. Tiryak, Community Legal Services, Philadelphia, Pa., for plaintiff.

Jerry I. Drew, Asst. Atty. Gen., Pennsylvania Dept. of Justice, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case raises the interesting question whether a long-term prison inmate segregated in a maximum-security housing unit at his own request for his own protection can nonetheless require prison authorities to afford him certain of the rights and privileges of inmates in the general prison population. For reasons which will in due course appear, we hold that, at least in some respects, he can.

Plaintiff is an inmate at the State Correctional Institution at Graterford, Pennsylvania (Graterford). In August, 1975, he was arrested on the aggravated morals charges described below and held in Montgomery County Jail in lieu of bail. The record indicates that at some point he spent a short time in Bucks County Prison. On February 26, 1976, following his conviction, he was transferred to Graterford. After expressing fears for his physical safety occasioned by the widespread publicity given his offenses, he was assigned to a housing unit known as the Behavioral Adjustment Unit (BAU).[1] The BAU is a maximum security unit used to segregate from the rest of the population those inmates who are violent, mentally ill, or need protection. Plaintiff is now and for a long time has been assigned to the BAU for his own protection.

Plaintiff does not seek to be transferred from the BAU. To the contrary, he requests that we order his continued assignment to the BAU. Rather, he challenges in this suit the following conditions and privileges afforded him as a BAU–assignee: (1) the fact that his cell has not been equipped with a chair, desk, or table, although cells in the general population are so equipped; (2) the fact that he has not been provided with any program for rehabilitation, while inmates in the general population have been

---

1. We were informed at the hearing on December 27, 1978 that the name of this unit was changed to "Restricted Housing Unit" at some time prior to hearing. However, the witnesses continued, for the most part, to refer to the "BAU" in their testimony. For the sake of clarity, we will use the term "BAU" when referring to the housing unit to which plaintiff is assigned.

provided with such programs; (3) his inability to leave his cell for more than one out of every twenty-four hours, although inmates in the general population are allowed more time out of their cells; (4) the fact that he has not been allowed to perform remunerative work, while inmates in the general population have been allowed such work; (5) the denial to him of the "idle pay" which is awarded to all inmates who are unable to work, except inmates like plaintiff who are confined in the BAU for their own protection; (6) the fact that he has been permitted to shower and shave only three times weekly, whereas inmates in the general population may shower and shave daily; (7) the denial of visitation rights equivalent to those afforded to prisoners in the general population; (8) the fact that he has not been permitted to attend weekly religious services of the Roman Catholic faith; and (9) the fact that he has not been permitted to do legal research in the prison law library.[2]

Plaintiff brought this action under 42 U.S.C. § 1983 for injunctive relief and damages[3] for alleged deprivation of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution.[4] He has also claimed that defendants violated Administrative Directive 801 of the Pennsylvania Bureau of Correction. After discovery, plaintiff moved for a preliminary injunction. By stipulation of counsel, we have treated that motion in all respects as a motion for a permanent injunction, see Fed. R.Civ.P. 65(a)(2), and have held a final hearing. Plaintiff requests a permanent injunction ordering defendants to permit him to attend weekly religious services; to allow him to visit the law library, to attend educational programs, and to receive visitors at the same times and with the same frequency as prisoners in the general population; to assign him remunerative work on the same terms as inmates in the general population; to award him "idle pay" when work is unavailable; to permit him to shower and shave daily; to furnish his cell with a desk and a chair; and to maintain his security by continuing to assign him to the BAU.

In terms of legal theory, plaintiff argues that he has been denied his constitutional rights of the free exercise of his religion and of meaningful access to the courts because he has been deprived of personal access to communal religious services in the prison chapel and to the prison law library. He argues that he has been deprived of equal protection of the laws in that other inmates enjoy greater rights and privileges than he does. He claims, further, that the denial to him of rights and privileges which other inmates enjoy violates Administrative Directive 801 of the Pennsylvania Bureau. In addition, plaintiff makes the following argument bottomed on the Eighth Amendment proscription of "cruel and unusual punishment." He contends that since his fear for his safety has an objective basis, which defendants recognized by assigning him to the BAU, defendants have a constitutional duty, included within the Eighth Amendment, to exercise reasonable care to protect him from violence directed at him by other inmates, and that while they have discharged that duty by assigning him to the BAU, they have improperly conditioned

2. Although plaintiff's claim relating to access to the Graterford law library was not alleged in his Amended Complaint, extensive evidence on that issue was adduced at the hearing, without objection, and both parties have addressed the issue in their memoranda of law. Consequently we treat the pleadings as amended to conform to the evidence. Fed.R.Civ.P. Rule 15(b).

In his Amended Complaint, plaintiff also alleged disparities in lighting, provision of hot water and cleaning and hygiene materials, permission to keep matches in his cell, use of silverware at meals, permission to smoke a pipe, and permission to tape materials onto cell walls. He also alleged that medical treatment was inadequate, that his mail was censored, and that the BAU was inadequately ventilated and infested by rodents. Since none of these allegations was supported at the hearing or addressed in plaintiff's proposed permanent injunction, we deem them abandoned.

3. This opinion and the accompanying order address only plaintiff's claim for injunctive relief. His claim for damages is not presently before us.

4. Concomitantly, jurisdiction is founded on 28 U.S.C. § 1343.

**1292**

his enjoyment of the opportunities, rights, and privileges available to inmates in the general population on renunciation of his Eighth Amendment right to protection. We refer to this as plaintiff's unconstitutional conditions claim.

■ Defendant Cuyler is the Superintendent of the State Correctional Institution at Graterford. The other twenty defendants are prison officials, members of the medical and psychological staff, and guards at Graterford. Defendants submit that plaintiff's fear for his safety is a mere subjective belief, without an objective basis. Moreover, they note that plaintiff is free to rejoin the general prison population at any time, and then will enjoy all the opportunities, rights, and privileges of the inmates in the general population. They argue that by requesting confinement in the BAU, plaintiff has waived those opportunities, rights, and privileges, and in any event, that the treatment afforded him during his confinement in the BAU meets all constitutional minima. Defendants also take issue with certain of plaintiff's factual allegations concerning the opportunities afforded him and the opportunities afforded prisoners in the general population.[5] They argue that the disparate treatment of plaintiff is necessary to the maintenance of prison security. And finally they disagree with plaintiff's application of constitutional theory.

We have found this to be a difficult and troubling case, in which the arguments of both the plaintiff and the defendants have considerable appeal. Upon analysis and reflection, and for reasons that will appear in Part III of this opinion, we have deter-

mined that plaintiff's Eighth Amendment argument is meritorious. While it has been a source of concern, we are satisfied that our decision accommodates fully the policy of broad deference to prison officials which was enunciated most recently in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Wolfish,* the Supreme Court held that courts must defer to the judgments of prison officials concerning prison security unless the officials have exaggerated their response to perceived security considerations. 441 U.S. at 548 & 551 & 555 & 561–62, 99 S.Ct. at 1878–79 & 1880 & 1882 & 1886. We are mindful of our obligation to defer to prison administrators, but we find that certain of the practices challenged in this action were the result of exaggerated responses to security considerations.

Our first task is to make findings of fact on the following matters: the nature of plaintiff's criminal convictions and attendant publicity; the general layout of the prison; the threats on plaintiff's life and his placement and retention in the BAU; the conditions of plaintiff's confinement in the BAU; and the security justifications for the challenged conditions. We will then turn to our discussion of the applicable law. This opinion constitutes our findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

## II. Findings of Fact

### A. The Nature of Plaintiff's Criminal Convictions and Attendant Publicity

In August, 1975, plaintiff was arrested on charges of burglary, felonious restraint, cor-

---

5. Defendants also argue that plaintiff's claims for remunerative employment when available, and for idle pay when employment is not available, are moot. Defendants provided plaintiff with a job shortly before the trial began. However, they have made no representations to the court or to the plaintiff that they will continue to employ him. Nor have defendants represented that they will give plaintiff idle pay when he is not employed. In fact, during the interval between the first and second days of trial, which were separated by several weeks, defendants downgraded plaintiff's employment from full-time to part-time. At the time of the second and final day of trial, plaintiff had not received any idle pay based on the downgrad-

ing of his employment. While the defendants provided plaintiff with temporary employment, they have not ceased their allegedly illegal activity, for they have evinced no intention to give plaintiff either a job or idle pay on a permanent basis. Even if they had indicated such an intention, plaintiff's claims would not be moot because the voluntary cessation of allegedly illegal practices does not moot claims for injunctive relief. *United States v. Concentrated Phosphate Export Association,* 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *Zurak v. Regan,* 550 F.2d 86, 95 n. 17 (2d Cir.), *cert. denied,* 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

ruption of minors, and deviate sexual intercourse. These charges were the result of complaints filed on behalf of eight young girls ranging in age from nine to thirteen years. He was subsequently convicted of the rapes of three of those girls. The first conviction was in Montgomery County, the second conviction was in Philadelphia, and the most recent conviction, in November, 1978, occurred in Bucks County. As a result of these convictions, plaintiff is serving a total sentence of forty to eighty years.

The publicity accompanying plaintiff's arrest and convictions was extensive. All the major Philadelphia daily newspapers and TV channels covered his arrest.[6] Plaintiff testified that the publicity made it necessary for his wife to be provided with police protection and for his son to be withdrawn from school.

Prisoners in the general population at Graterford have access to television, radio, and newspapers. It is highly probable, and not disputed in the record, that at least some inmates at Graterford know of the nature of plaintiff's offenses.

B. *The Prison Layout*

Within the prison walls at Graterford there are three buildings: the main building, the powerhouse, and the BAU. The main building encompasses five cell blocks as well as the chapel, school, law library, and visitation room. The prison kitchen, auditorium, hospital, administrative offices, and industrial plant are also located in the main building. Inmates in the general population are housed in the five cell blocks. Cells remain unlocked between the hours of 6 A.M. and 4 P.M., and from 5 P.M. until 9 P.M., during which time the inmates are free to move about the cell block.

In the rear of one cell block is an area consisting of fifty cells separated from the rest of the block by cyclone fencing and a gate. This area is known as B-gallery. It houses those inmates who require closer security than is available in the general population. Inmates there are locked in their cells except for periods of recreation in the yard, meals in the dining room, medical treatment, and visits. B-gallery inmates have contact with each other during recreation and meals, and may also come in contact with the general population in moving back and forth from these places. B-gallery inmates are assigned work in B-gallery when available. Inmates who have committed themselves to B-gallery are permitted to go to the chapel and the law library, but are not escorted by guards if they choose to go there.

The BAU is located in a separate building and constitutes the most secure housing at Graterford. BAU inmates are locked in their cells approximately twenty-three hours per day. Meals are served to them in their cells, and the inmates are not in physical contact with one another during recreation periods in the yard. Prisoners in the BAU ordinarily leave the BAU building only to go to the visitation room in the main building to see attorneys or other visitors. In such instances, prisoners are taken from the BAU to the main building in a station wagon and are escorted by two guards.

The BAU houses three categories of inmates: (1) those assigned for disciplinary reasons; (2) those who are severely mentally disturbed; and (3) those who are there for their own protection. Plaintiff falls into this latter category. At the time of trial, three other inmates were housed in the BAU for their own protection. Superintendent Cuyler testified that this was a "relatively high number" compared to the usual number of inmates lodged in the BAU for their own protection.

---

**6.** The crimes themselves and the police search for the perpetrator had been widely publicized. Indeed, just prior to our hearing, we read a newspaper article in the Philadelphia Inquirer reporting that plaintiff had been sentenced in Bucks County. We informed counsel of the contents of this article at a prehearing confer- ence. We also noted at hearing that one of our law clerks had seen a television report of the sentencing on television channel 10. The publicity surrounding these events was highlighted by plaintiff's status as a well-known former high school football star in Northeast Philadelphia.

C. *The Threats Upon Plaintiff's Life; His Placement and Retention in the BAU*

Plaintiff's first incarceration was in Montgomery County Prison when he was awaiting trial. Plaintiff testified that while he was lodged there, other prisoners threw firebombs, burning newspapers, and cigarettes into his cell, and that many verbal threats were directed at him. He described these threats:

> Well, these were prisoners, inmates. We'll get you. We can get you. They used the terms baby raper, child molester.

As a result, he was segregated from the other prisoners at Montgomery County Jail. At Bucks County Prison, prior to transfer to Graterford, the word reached him through another inmate that there were inmates "waiting for him" at Graterford.

These occurrences formed the basis for plaintiff's request for protection upon arrival at Graterford. At a hearing before defendants Mauger, Schildt, and Spaid, he told them that numerous attempts had been made on his life because of the nature of the crimes for which he had been sentenced, and that he was concerned about his physical safety at Graterford. He was then assigned to the BAU.

Plaintiff contends that initially he did not specifically request placement in the BAU. Defendants claim that he did request such placement. There is no dispute, however, that plaintiff does not now wish to be transferred out of the BAU, but wishes to remain there. Defendants point out and plaintiff concedes that he is free to go to the general population or to B-gallery at any time. Defendants note that most self-protection cases are housed in B-gallery. However, plaintiff fears that he cannot be adequately protected in these areas where contact among inmates is less restricted, and therefore chooses to remain in the BAU. Indeed, in May 1977 plaintiff was removed from the BAU and placed in B-gallery.[7] After approximately two hours on B-gallery, plaintiff requested the guards to return him to the BAU, and he was returned there. Plaintiff testified that during those two hours, he was threatened by two prisoners in the main portion of "B" cell block, who called him by name and said that they could "get" to him. During that scant two hours, either those prisoners or two others called plaintiff a "baby-raper" and "child molester."

Plaintiff also testified that he has been threatened even while in the BAU. He testified that he has heard prisoners in the yard call his name and threaten him with death. We credit that testimony. Plaintiff was thus subjectively in fear. We also find that there was an objective basis for that fear. If plaintiff were transferred out of the BAU, other prisoners would indeed be able to "get" to him. Moreover, plaintiff's contention that he has reason to fear for his safety was supported by the testimony of an expert witness.

Dr. Edward V. Guy, the Director of Psychiatric Services for the Philadelphia prison system, testified that the lowest status among prison inmates is generally reserved for persons convicted of sex crimes against children. He testified that he had found "a very active type of a threatening attitude" toward such inmates among other inmates, and that in the Philadelphia prison system, a person convicted of a sex crime against a child would "automatically" be housed differently from the general population. While other inmates there are housed in dormitories, sex offenders against children are housed initially in individual cells with some access to other inmates. Dr. Guy testified that "almost invariably within a day or two . . . once the threats begin," such offenders request transfer to a maximum security cell.[8] We find Dr. Guy's

---

7. The reasons for this move were not revealed at trial.

8. The syndrome was described in Short Eyes, a play by Miguel Pinero, an ex-convict, which won the New York Drama Critics Circle Award as Best American Play of 1973–74. The play concerns the murder of an accused child molester by other inmates in a House of Detention. The appended glossary of prison slang defines "short eyes" to mean "Child molester; according to prisoners, the lowest, most despi-

testimony as to conditions and practices in the Philadelphia prison system, and the plaintiff's own testimony as to his own experiences in other prisons in Eastern Pennsylvania, to be probative of the reasonableness of plaintiff's apprehension of danger to his physical security at Graterford. *See Withers v. Levine*, 449 F.Supp. 473, 476 (D.Md.1978). Indeed, that apprehension was acknowledged by the defendants, who assigned plaintiff to the BAU in response to his expressed fears of physical assault by other inmates, and who have never attempted to transfer him from the BAU, with the possible exception of the two hours he spent on B-gallery.

### D. *The Conditions of Plaintiff's Confinement in the BAU*

The basis of plaintiff's complaint is the disparity between the opportunities and programs available to prisoners in the general population at Graterford, and the restricted opportunities available to him in the BAU. He presented evidence at the hearing of disparities in access to religious services, access to the prison law library, the availability of educational programs, employment and idle pay, cell furniture, time out of lock-up, personal hygiene, and access to visitors. We consider each of these topics in turn.

### 1. Access to Religious Services

Inmates in the general population and in B-gallery are permitted to attend weekly religious services in the prison chapel, located in the main prison building. Plaintiff is a Roman Catholic who regularly attended Mass before his incarceration. During his confinement in the BAU, plaintiff has not been permitted to attend communal religious services.

Plaintiff has requested that defendants permit him to receive communion in the BAU once a week. He testified that a priest had visited him in the BAU only sporadically and had given him communion at times varying from approximately once a month to once every four months. Defendants state that although plaintiff is not permitted to attend services with other prisoners for security reasons, he may receive daily chaplain visits and be given communion in his cell. Plaintiff testified at the hearing that he was willing to accept chaplain visits in the BAU in lieu of being escorted to the prison chapel. We accept the parties' word on these points.

### 2. Access to the Prison Law Library

Prisoners in the general population are permitted to go to the prison law library, which is located in the prison school building, to do research. The library is open from about 8:30 or 9:00 a. m. to 11:00 a. m., from 1:00 p. m. to 3:30 p. m., and from 6:00 to 8:00 or 8:30 p. m. The library hours are the same as the hours of the prison school, of which it is a part. Staff members and guards are not on duty in the library or the school building during the hours when it is not open, and the entire building is generally locked during those hours.

Plaintiff has not been permitted to go to the prison law library. A few months before trial, defendants began to provide plaintiff with photocopies of judicial opinions which he requests. These copies are often blurred, and plaintiff frequently has been told that the library does not have the cases which he requested. Plaintiff has not been permitted to meet with or obtain as-

---

cable kind of criminal." M. Pinero, Short Eyes, 126 (Mermaid ed. 1975). Early in the play, a sympathetic inmate tells the victim, "If I was you I'd ask transfer to protection . . . cause . . . if you remain on this floor you're asking to die . . . . You'll be committing involuntary suicide." *Id.* at 30.

Independently of this action, we have been assigned another case which suggests that plaintiff's fears are at least within the bounds of reason. *Mastrota v. Robinson*, Civil Action

No. 79–1914 (E.D.Pa. filed May 29, 1979). The plaintiff in that case alleges that upon his transfer to Graterford, he requested placement in maximum security for protection because of his notoriety, but instead was placed in the general population overnight. During that brief time in the general population, he alleges, he was stabbed by another inmate while under escort by two prison guards. The character of Mastrota's offenses is not apparent from the pleadings.

sistance from the paraprofessional law clinic at Graterford. Plaintiff has, however, stated through counsel that he is willing to accept the opportunity of doing legal research in the BAU in lieu of being transported to the law library.

### 3. Availability of Educational Programs

The prison has a wide variety of educational programs available to inmates from kindergarten to college level. According to Superintendent Cuyler, these programs exist to assist in the rehabilitation of inmates. An inmate's participation in educational programs is a factor in the determination whether he will be recommended for parole.

Plaintiff has not been permitted to participate in educational programs with other prisoners outside the BAU. Moreover, he has never been offered the opportunity to receive education by means of correspondence courses and tutors in his cell, and has been unaware that such an opportunity existed. Defendants state, however, that while he is in the BAU, plaintiff may receive educational programs in the form of correspondence courses and tutors in his cell. A prison official testified that tutors had been permitted into the BAU in the past, and would not cause a security problem. We accept that representation. The plaintiff testified that he would be satisfied with having tutors and educational materials in the BAU in lieu of being escorted to educational programs with other inmates.

### 4. Employment and Idle Pay

Inmates in the general population at Graterford are permitted to perform remunerative work. Work is available to inmates to make them productive, to reduce idleness, and to facilitate rehabilitation. One factor in the prison's determination whether to recommend a prisoner for parole is his participation in, and success or failure at work programs. Inmates in the general population who are unable to work receive "idle pay." Furthermore, inmates in the BAU who are confined for disciplinary reasons or because they are mentally ill receive idle pay. Only inmates in the BAU who are confined there for their own protection receive no idle pay.

During most of the time of his confinement in the BAU, plaintiff has not been permitted to engage in remunerative work, and has not received idle pay. Approximately two weeks before the first day of hearing in this case, plaintiff was given a job stripping down a section of the BAU which was being renovated. He worked along with two other inmates who were confined in the BAU for their own protection. They were issued sledge hammers, crow bars, hammers, and chisels. That job was for 8 hours a day, six days per week. Between the first and second hearings in this case, plaintiff was terminated from that job and assigned another job which required him to work only one day out of every three. Defendants have made no assurances to plaintiff that he will continue to receive remunerative work or idle pay.

### 5. Cell Furniture

Cells in the general population at Graterford are equipped with a chair. Cells in one block out of the total of five are also equipped with a desk. Cells in the BAU, including plaintiff's, are furnished with neither a chair nor a desk.

### 6. Other Disparities

Inmates in the general population are permitted to leave their cells for at least ten hours per day. While confined in the BAU, plaintiff has been permitted to leave his cell for but one hour per day, except when he is working. During this hour, he is permitted to exercise alone outdoors.

Inmates in the general population are permitted to shower and shave daily. Except while he was working six days per week, plaintiff has been permitted to shower and shave only three times per week. While he was employed six days a week, plaintiff was permitted to shower and shave six times per week. Plaintiff's cell is equipped with a sink that he may use for washing.

All inmates are limited to one visit per week. Inmates in the general population are permitted to see visitors on holidays, evenings, and weekends. Inmates in the BAU, including plaintiff, are permitted to see visitors only on Saturday mornings. These limitations do not apply to prisoners' consultations with their attorneys.

E. *Security Justifications for the Challenged Conditions*

■ Defendants have asserted that the restricted opportunities afforded plaintiff are justified by security considerations. We are obligated by the recent decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), to defer to the decisions of prison officials on matters of security unless substantial evidence shows that they have exaggerated their responses to the perceived security problem. *See* discussion *infra*.

Plaintiff has testified that to insure his safety he needs an escort of two guards to accompany him to religious services and other programs where he would come into contact with other prisoners. Indeed, he has indicated that even if we order defendants to permit him to attend religious services and educational classes and to go to the law library, he would not do so unless accompanied by a two-guard escort, because of fears for his safety. Defendants do not contest plaintiff's evaluation of the necessity of a two-guard escort, except for their blanket assertion that all plaintiff's fears for his safety are insubstantial, a contention which we have rejected. Accordingly, we accept plaintiff's testimony that he cannot safely be transported to programs where he would come into contact with other prisoners unless he is accompanied by two guards.

Defendants argue that giving plaintiff the required escort would compromise the security of the institution as a whole by reducing the number of guards in the remainder of the institution. At no time are there more than 40 guards working within the institution.[9] Assigning a two-guard escort to plaintiff would reduce that complement by 5%, and might lead to an increased likelihood of escape, violence, pilferage, and vandalism in the institution. We find that defendants' response to this proposal has not been exaggerated, and we must defer to their judgment on the "escort" aspect of plaintiff's proposed relief.

Defendants argue further that the security of the BAU itself would be weakened if they had to open the doors frequently to transport plaintiff to programs which are conducted outside the BAU building. The chapel, prison law library, and prison school, to which plaintiff seeks personal access, are all located in a separate building from the BAU building. Superintendent Cuyler testified that some of the most dangerous inmates in the entire state prison system are housed in the BAU, and that he is concerned about the possibility of escapes.[10] We cannot and do not find that the defendants' concern for the risk to BAU building security that would be created by frequently transporting plaintiff from the BAU to the main prison building is exaggerated.

These problems—the weakening of BAU security and the weakening of total institution security caused by diversion of guards from other areas of the institution—would arise whenever plaintiff is transported from the BAU to a program in the main prison building where he would come into contact with other inmates. Since we have not found that the prison administrators' response to these problems is exaggerated, we must defer to their judgment. These security problems thus control our disposition of plaintiff's claims for personal access to com-

---

**9.** This figure excludes guards assigned to the perimeter patrol, the vehicle lot, the pedestrian gate, and other locations outside the prison buildings.

**10.** By way of contrast, Superintendent Cuyler also testified that the doors of the BAU are opened "on a routine basis" to transport pris-

oners to the visiting room, and another defense witness testified that the doors are opened "all the time." We cannot, however, find that the defendants' concern for the additional risk that would be created by transporting the plaintiff from the BAU to the main building is exaggerated.

munal religious services, personal access to the law library, personal attendance at educational classes, and work outside the BAU.

Defendants contend also that a security risk would be created by opening the doors of plaintiff's own cell. Their concern for that risk is plainly exaggerated. None of the relief sought by plaintiff would require defendants to open any other prisoner's cell in the BAU. Defendants have never claimed that plaintiff himself presents a security risk. To the contrary, they emphasize that he is free to rejoin the general population whenever he wishes.

Defendants argue further that giving plaintiff privileges not enjoyed by other inmates in the BAU would increase resentment against him felt by the other inmates. Although Superintendent Cuyler testified in general terms that "we have an unwritten rule . . . that we try not to do for one inmate or any group of inmates something that we can't do for our entire population," another defense witness testified that defendants have regularly granted some prisoners in the BAU more benefits, including jobs and television and radio receivers, than other prisoners in the BAU, and that no breakdown in BAU security has resulted. We note also that plaintiff seeks no privileges or opportunities which are not already enjoyed by prisoners in the general population. We find that defendants' argument concerning prisoner resentment is speculative, and that to the extent that disparate treatment of plaintiff is based on the anticipation of prisoner resentment it is an exaggerated response to any security problems that may exist.

Finally, defendants argue that their refusal to furnish the plaintiff's cell with a chair is justified by the security consideration that he might dismantle the chair and use it as a weapon. While this reasoning would be persuasive as applied to inmates who are confined in the BAU because they present security risks themselves, it is inapplicable to plaintiff. As we have noted above, defendants have never asserted that plaintiff is a security risk himself. Indeed, they have provided him with a sledge hammer and other heavy tools for use in his former job in the BAU. Consequently, we find that the denial to plaintiff of a chair in his cell is an exaggerated response to any perceived security problem.

III. *Discussion*

Our analysis begins, as it must, with the recent opinion of the United States Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Wolfish*, the Court considered a challenge to the conditions of confinement of pretrial detainees at the Metropolitan Correctional Center (MCC), a federal facility in New York City. Much of the Court's reasoning is expressly made applicable to convicted inmates as well as to pretrial detainees. 441 U.S. at 546 n.28 & 547 n.29, 99 S.Ct. at 1878 n.28 & n.29. The Supreme Court indicated that courts should accord great deference to correctional officials' decisions about the security needs of their institutions, and enunciated a standard for judicial review of such decisions:

> Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, *in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations,* courts should ordinarily defer to their expert judgment in such matters."

441 U.S. at 547–48, 99 S.Ct. at 1878–79 (emphasis added) (citations and footnotes omitted). In evaluating challenged conditions at MCC against a background of security considerations, the Court determined that the record would not support an inference that MCC officials had exaggerated their responses to security problems. 441 U.S. at 551 & 555, 99 S.Ct. at 1880 & 1882. The Court concluded that respondents in *Wolfish* "simply have not met their heavy

burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices." 441 U.S. at 561–62, 99 S.Ct. at 1886. In our findings of fact, we concluded that plaintiff had met this burden with respect to several of the practices which he challenges here.[11]

■ However, such a conclusion does not resolve the matter, for in order to be entitled to relief in this action brought under 42 U.S.C. § 1983, plaintiff must establish that he has been deprived of rights secured to him by the Constitution and laws of the United States. *See, e. g., Basista v. Weir,* 340 F.2d 74 (3d Cir. 1965). Plaintiff in fact maintains that he has been deprived of constitutional rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution. He claims that denial of his personal access to religious services and to the law library violates his rights under the First and Fourteenth Amendments. He maintains that the denial to him of employment, idle pay, participation in educational programs, and other benefits enjoyed by inmates in the general population, solely because he is confined in the BAU for his own protection, is an unconstitutional burden on his Eighth Amendment right to be protected reasonably from violence directed at him by other inmates.[12] And he advances a claim under Administrative Directive 801 of the Pennsylvania Bureau of Correction, over which we exercise pendent jurisdiction.

Our task is made somewhat easier by the apparent agreement of the parties on the issues relating to plaintiff's access to religious services, use of the law library, and availability of educational programs. The defendants state that under existing prison policy, plaintiff may receive daily visits from the prison chaplain and may be given communion in his cell; that he will be provided with photocopies of materials from the prison law library for use in his cell; and that he may participate in educational programs by means of tutors and correspondence courses in his cell. Plaintiff denies that these arrangements have been made available to him in the past, but has indicated that he is willing to accept them in lieu of being transported under guard to the prison chapel, library, and school. We address these arrangements here only to explain why the constitution requires no more of defendants but permits no less.

### A. Denial of Personal Access to Religious Services

■ Prisoners must be afforded reasonable opportunities to exercise the religious freedom guaranteed by the First and Fourteenth Amendments. *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). In the Third Circuit, a restriction on the free exercise by prisoners of their religion is deemed reasonable only if it is the least restrictive alternative that is consistent with the maintenance of prison discipline. *O'Malley v. Brierley,* 477 F.2d 785 (3d Cir. 1973); *X v. Brierley,* 457 F.Supp. 350 (E.D.Pa.1978) (Luongo, J.). However,

---

**11.** We note also that the Supreme Court was strongly influenced in *Wolfish* by the fact that a large majority of the MCC detainees were incarcerated there for less than 60 days. 441 U.S. at 543 & 552 & 555 n.35 & 562, 99 S.Ct. at 1876 & 1881 & 1882 n.35 & 1886. Here, in contrast, the plaintiff has been sentenced to a minimum term of forty years.

**12.** Plaintiff also argues that he has been deprived of equal protection of the laws. With respect to the denial of access to religious services and to the law library, he argues that he is deprived of fundamental rights in the absence of a compelling state interest. With respect to all other disparities between his opportunities

and those afforded to prisoners in the general population, he argues that those disparities are not rationally related to furthering a legitimate state interest. We do not reach either of these arguments. Even if plaintiff prevailed on both arguments, he would be entitled to no greater relief than we award upon our consideration of his other arguments. His fundamental rights are afforded as great protection by our examination of their constitutional sources as they would be afforded under Fourteenth Amendment equal protection analysis. His rational-relation claim is at best duplicative of his Eighth Amendment argument which we treat extensively.

in determining what the least restrictive alternative is, we must defer to prison officials' evaluation of security risks unless their response is exaggerated. In *Wolfish, supra,* the Supreme Court indicated that such deference was due prison administrators "even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment." 99 S.Ct. at 1878. In particular, we must defer to defendants' assessment of the security risks associated with opening the BAU and diverting guards to escort plaintiff to the main prison building, as we have explained in Part II–E, *supra.* Because of these security considerations, plaintiff is not entitled to attend religious services in the prison chapel.[13]

■ On the other hand, no substantial security considerations preclude plaintiff from receiving regular visits from a prison chaplain and receiving communion or mass in his cell. Prisoners in segregated confinement are entitled at least to individual religious ministration in their cells. *E. g., Sweet v. South Carolina Department of Corrections,* 529 F.2d 854 (4th Cir. 1975) (en banc); *Diamond v. Thompson,* 364 F.Supp. 659 (M.D.Ala.1973), *aff'd,* 523 F.2d 1201 (5th Cir. 1975). Since defendants have asserted

no security justification for limiting the frequency of plaintiff's religious exercise, they must permit him to see a chaplain of the Roman Catholic faith at least as frequently as prisoners in the general population are permitted to attend religious services.

## B. Denial of Personal Access to the Law Library

■ In *Bounds v. Smith,* 430 U.S. 871, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498. *See also Bryan v. Werner,* 516 F.2d 233 (3d Cir. 1975); *Wade v. Kane,* 448 F.Supp. 678 (E.D. Pa.1978) (Lord, C. J.), *aff'd,* 591 F.2d 1338 (3d Cir. 1979). The Supreme Court emphasized, however, that its decision "does not foreclose alternative means" of assuring meaningful access to the courts. 430 U.S. at 830, 97 S.Ct. 1491. The Court observed, for instance, that the constitutional requirement might be met through a program of legal assistance provided by inmates who

---

**13.** In *St. Claire v. Cuyler,* 481 F.Supp. 732 at 739–741 (E.D.Pa.1979), Chief Judge Lord has held that the Graterford rule prohibiting chapel attendance by all prisoners housed in segregated units is invalid. He ordered the prison authorities to permit the plaintiff Frank "X" St. Claire to attend religious services "unless it is determined after full hearing, followed by appropriate findings of fact, that the plaintiff's attendance at religious services constitutes a threat to prison discipline or the prison population." *Id.* Order ¶ 4. He instructed the prison authorities to undertake a two-tier analysis before restricting chapel attendance of a prisoner housed in a segregated unit:

> [F]irst, assess whether a particular inmate is unruly or likely to cause security problems by his presence at chapel; then, if necessary, structure a staggered or rotating attendance schedule that would incorporate both the religious requirements of the inmates and the deployment-of-personnel concerns of the administration.

*Id.* at 741. Chief Judge Lord noted that the record was insufficient to show that St. Claire's attendance at chapel would raise bona fide se-

curity considerations. *Id.* at 740. He cited with approval a line of cases holding that it is constitutionally valid to restrict the chapel attendance of segregated inmates whose attendance would create security problems. *Id.* at 740–741.

In the case at bar, defendants have shown that Wojtczak's attendance at chapel implicates genuine considerations of security. Because he is in objective danger of assault, Wojtczak cannot safely attend religious services with any other prisoners unless accompanied by a two-guard escort. As we have found, providing this escort would diminish the security of the institution, and opening the BAU to transport plaintiff to the main building would diminish BAU building security. Moreover, a staggered or rotating attendance schedule would be of no avail to Wojtczak because he is in danger whenever he is accessible to other inmates. Thus our decision is consistent with *St. Claire.* However, nothing in this opinion should be construed to permit defendants to exempt Wojtczak from any administrative review procedure which they institute as a result of *St. Claire.*

were trained as paralegal assistants working under a lawyer's supervision. *Id.* at 831, 97 S.Ct. 1491.

While the Supreme Court has "consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts," *id.* at 824, 97 S.Ct. at 1496, and this right was not before the Court in *Wolfish, supra,* in the wake of that decision we must extend some deference to the judgments of prison officials as to the security concerns that would be implicated if plaintiff were permitted to go the law library under escort. *See also Procunier v. Martinez,* 416 U.S. 396, 420, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974). The security risks involved here are the same that preclude plaintiff's personal attendance at the prison chapel. Accordingly, we follow our earlier reasoning and hold that plaintiff need not be afforded personal access to the library. In such circumstances, other courts have held that the constitutional right or meaningful access to the courts is satisfied by providing legal materials to prisoners in their cells. *Arsberry v. Sielaff,* 586 F.2d 37, 44 (7th Cir. 1978); *Frazier v. Ward,* 426 F.Supp. 1354, 1371 (S.D.N.Y.1977). We agree.

In *Bryan v. Werner, supra,* the Third Circuit held that a regulation prohibiting an inmate-run clinic from assisting inmates in filing certain suits violated their right of access to the courts, in the absence of reasonable alternatives for obtaining access. The court stated, "If there is no alternative and readily available means of obtaining assistance of at least equal caliber, the restriction must be invalidated." 516 F.2d at 237. While the defendants may provide legal materials to plaintiff in his cell, the opportunity to do legal research which is thereby afforded him must be at least the equivalent of the opportunity that is available to an inmate who is permitted to go personally to the prison law library. We therefore hold that the legal materials pro-

vided to plaintiff in his cell must be legible, that they must be supplied to him within 48 hours of his request, and that he may request legal materials at least as frequently as he would be permitted to visit the law library if he were in the general population.[14]

### C. *Denial of Employment and Idle Pay*

■ As we have found, plaintiff has been denied the opportunity to engage in remunerative employment or, when work is not available, to receive idle pay. Defendants provided plaintiff with a job immediately before the trial of this action began, but have made no representations to him or to us that they will continue to employ him or to grant him idle pay. Defendants pay idle pay to inmates who are in the BAU for reasons other than their own protection; they deny idle pay only to inmates who are housed in the BAU because they need protection from other prisoners.

Administrative Directive 801 of the Pennsylvania Bureau of Correction includes provisions governing the treatment of prisoners who are assigned to restricted housing units such as the BAU. The Directive provides:

The inmates [in the BAU] shall have all the rights and privileges accorded to the general population except for freedom to move about the institution, freedom to engage in programs with the general population, the use of civilian clothing and the use of items specifically found by the Program Review Committee to be a security hazard.

Administrative Directive 801, Part VI.A.2 (effective October 1, 1978). The denial to plaintiff of the opportunity to work or to receive idle pay, when those benefits are afforded to prisoners in the general population, is contrary to the plain language and

---

**14.** In *Wade v. Kane, supra,* Chief Judge Lord found the Graterford law library constitutionally deficient because it lacked essential law books. If this situation has not been rectified, plaintiff's access to legal materials may not

satisfy the constitutional minimum. In that case, he may apply for modification of our order to permit him to meet with members of the paraprofessional inmate-run law clinic in his cell.

the facially apparent meaning of this provision.[15]

Although we deal here with a state law claim, we must nevertheless apply to this situation the overriding principles of *Bell v. Wolfish, supra.* The policy of judicial deference to prison administrators stated in *Wolfish* is based on a recognition of the limitations on judicial competence "to deal with the increasingly urgent problems of prison administration and reform." 441 U.S. at 548 n.30, 99 S.Ct. at 1879 n.30, *quoting Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Since that policy arises from these broad prudential considerations, it should be applied by federal courts whenever they are called upon to scrutinize the decisions of prison administrators, no matter whether their scrutiny is founded on federal or state law. Accordingly, we must defer to the judgments of the Graterford authorities concerning any applicable security problems unless we find that their response is exaggerated.

We note initially that no security justification has been advanced for denying plaintiff idle pay when he is not working. The only reason defendants have advanced for denying him idle pay is to deter prisoners in the general population from fraudulently seeking protective confinement in the BAU in order to avoid work. This reasoning is not sufficient to justify a clear violation of Administrative Directive 801. We are confident that the defendants have the power to determine whether individual applications for confinement in the BAU are spurious, and need not rely on a blanket exclusion which unnecessarily penalizes inmates who are validly confined in the BAU for their own protection. When individual determinations are readily available, the use of a broad generalization which disadvantages a constitutionally cognizable group is unnecessary. *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 1113, 59 L.Ed.2d 306 (1979) (use

of gender as a proxy for financial need held unconstitutional because individual determinations of need were available). *See* n.16, *infra.*

The assignment of plaintiff to work outside the BAU would implicate the security considerations related to taxing the guard force and weakening the building security which we have already held preclude plaintiff's personal access to the law library and to religious services. We note, too, that Administrative Directive 801 permits limitations on plaintiff's "freedom to move about the institution," and thus does not require that he be assigned to work outside the BAU. For these reasons, we do not order defendants to assign plaintiff to work outside the BAU, but only to provide him work within the BAU building when such employment is available. The record has not been developed with respect to security risks involved in assigning plaintiff work inside the BAU, or the availability of work there. It is clear, however, that no security considerations preclude plaintiff from ever being assigned remunerative work, since he was given work shortly before the first hearing in this action. Because we are uncertain what risks to security may exist, we hold only that plaintiff must be provided with remunerative employment when suitable employment is available, consistent with security precautions, and that plaintiff must be given idle pay when he is not working.

D. *Denial of Other Benefits (The Unconstitutional Conditions Claim)*

In addition to the denial of personal access to communal religious services and to the law library, and the denial of employment and idle pay, plaintiff complains as well of a number of other disparities between the opportunities, rights, and privileges afforded him during his confinement in the BAU, and those afforded prisoners in

---

**15.** We exercise our pendent jurisdiction over this state claim which arises from the same facts as plaintiff's § 1983 claim. *See Hagans v. Levine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Since counsel for the defendants

has never opposed the implication of a private right of action from Administrative Directive 801, we deem any objection on that basis to have been waived.

the general population at Graterford. In particular, he complains of disparities in the availability of educational programs, in cell furnishings, in time out of the cell, in the frequency of opportunities to shower and shave, and in the hours of visitation. We have already made factual findings with respect to these disparities.

We emphasize that plaintiff does not argue, and we do not hold, that the limited rights and privileges afforded him in themselves constitute cruel and unusual punishment. Such an argument or holding would be contrary to the clear weight of precedent. *See, e. g., Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Padgett v. Stein,* 406 F.Supp. 287, 296 (M.D.Pa.1975). *See also Nadeau v. Helgemoe,* 561 F.2d 411 (1st Cir. 1977). However, for reasons which will appear, we believe that the denial to plaintiff of benefits which other prisoners enjoy, solely because he is in need of protection from other inmates, violates the Eighth Amendment unless the disparity is justified by considerations of institutional security. Put differently, we conclude that, absent valid security considerations, plaintiff may not be required to renounce his right to reasonable protection from other inmates as a condition of receiving the opportunities afforded to prisoners in the general population.[16]

### 1. The Eighth Amendment Right to Protection from Other Inmates

█ Our analysis proceeds from the proposition that correctional authorities have an obligation to protect inmates from violence and assaults directed at them by other inmates. Judge Van Dusen has explained that "the right of a prisoner to be reasonably free from an atmosphere conducive of sexual assault is a constitutional right; it falls within the Eighth Amendment right against cruel and unusual punishment." *United States ex rel. Ricketts v. Lightcap,* 567 F.2d 1226, 1235 (3d Cir. 1977) (concur-

ring opinion). Moreover, in *Woodhous v. Virginia,* 487 F.2d 889, 890 (4th Cir. 1973), the Fourth Circuit held:

> A prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief.

*Accord, Rudolph v. Locke,* 594 F.2d 1076 (5th Cir. 1979); *Little v. Walker,* 552 F.2d 193 (7th Cir. 1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 858 n.3 (4th Cir. 1975) (en banc); *Finney v. Arkansas Board of Corrections,* 505 F.2d 194, 201 (8th Cir. 1974); *Stevens v. County of Dutchess,* 445 F.Supp. 89 (S.D.N.Y.1977). The danger of assault may be proved by evidence of events at other penal institutions in the area, as well as at the institution at which the prisoner is serving his sentence. *Withers v. Levine,* 449 F.Supp. 473, 476 (D.Md. 1978).

### 2. The Eighth Amendment and the Doctrine of Unconstitutional Conditions

█ The defendants have accommodated Wojtczak's well-founded apprehension of harm by housing him in the BAU. His assignment to the BAU was made after a hearing at which he expressed his well-grounded fear of assault. We cannot say that by assigning Wojtczak to the BAU, defendants have failed to satisfy their duty of reasonable care to protect him from violence. However, as a condition of receiving this protection, the defendants have deprived Wojtczak of some rights and privileges which would have been available to him if he had remained in the general population. Defendants argue that by requesting voluntary confinement in the BAU, the plaintiff has waived the rights and privileges granted to prisoners in the general population. Although plaintiff does request continued confinement in the BAU for his own

---

16. Our reasoning in this section is also applicable to plaintiff's claims for remunerative employment and idle pay and constitutes an alter-

nate holding with respect to them, although we have disposed of those claims on the basis of state law.

protection, we believe that, under the facts of this case, defendants' waiver argument is unsound. Defendants would condition plaintiff's enjoyment of the opportunities available to prisoners in the general population on his willingness to be reassigned to the general population. Thus defendants would require plaintiff to choose between those opportunities and his constitutional right to be protected reasonably from harm from other inmates.

The short of it is that defendants would deny plaintiff the opportunity to participate in educational programs, to have a chair in his cell, and otherwise to receive treatment equivalent to that afforded prisoners in the general population, because he has exercised his Eighth Amendment rights. This is impermissible. In *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court analyzed a similar denial of benefits as follows:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.

408 U.S. at 597, 92 S.Ct. at 2697. *Accord, Elrod v. Burns,* 427 U.S. 347, 358–61, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *Frissell v. Rizzo,* 597 F.2d 840, 845 (3d Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 82, 62 L.Ed.2d 52 (1979).

In fact, the antecedents of the doctrine of unconstitutional conditions are far older than the quarter-century claimed by the *Perry* Court. In *Insurance Company v. Morse,* 87 U.S. (20 Wall.) 445, 22 L.Ed. 365 (1874), the Court invalidated a Wisconsin statute which permitted foreign corporations to do business in Wisconsin only on the condition that they waive their right to remove suits filed against them in the state courts to federal court. The Court held that although the state could absolutely prohibit a foreign corporation from doing business in Wisconsin, it could not impose conditions "which are repugnant to the Constitution and laws of the United States." *Id.* at 456–57. The Wisconsin law was unconstitutional because it obstructed the petitioner in the exercise of his rights under Article III of the Constitution and the Judiciary Act of 1789. In *Frost v. Railroad Commission,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926), the Court traced the development of the doctrine during the preceding half-century, concluding:

> If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

271 U.S. at 594, 46 S.Ct. at 607. *See generally* L. Tribe, American Constitutional Law 510 (1978); Van Alstyne, *The Demise of the Right—Privilege Distinction in Constitutional Law,* 81 Harv.L.Rev. 1439, 1445–49 (1968); O'Neil, *Unconstitutional Conditions: Welfare Benefits with Strings Attached,* 54 Cal.L.Rev. 443 (1966); Note, *Unconstitutional Conditions,* 73 Harv.L.Rev. 1595 (1960); Hale, *Unconstitutional Conditions and Constitutional Rights,* 35 Colum.L.Rev. 321 (1935); Merrill, *Unconstitutional Conditions,* 77 U.Pa.L.Rev. 879 (1929).

The doctrine of unconstitutional conditions has been applied most frequently in recent years to protect First Amendment

rights.[17] For example, in *Perry v. Sinder-mann, supra*, an untenured college professor challenged the nonrenewal of his employment contract with a state college. He alleged that the decision not to rehire him was based on his public criticism of college policies. The Supreme Court held that his continued employment could not be conditioned on the surrender of the right to freedom of speech. *Perry* is but one in a long line of cases in which the Court has protected public employees from discharge for reasons that infringe their rights to freedom of speech. *E. g., Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *Elrod v. Burns, supra*, the Court followed *Perry, supra*, to hold that a system of political patronage dismissals of public employees unconstitutionally conditioned their employment on the nonassertion of their rights to freedom of association and belief. 427 U.S. at 358–61, 96 S.Ct. 2673 (plurality opinion); *id.* at 375, 96 S.Ct. at 2690 (concurring opinion).

The Supreme Court has also applied the doctrine of unconstitutional conditions to protect First Amendment interests in the free exercise of religion. In *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court held that South Carolina could not constitutionally deny unemployment benefits to a claimant who refused to work on Saturday because of her religious beliefs. The Court commented, "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." 374 U.S. at 404, 83 S.Ct. at 1794. And in *McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), the Court invalidated a Tennessee statute which disqualified members of the clergy from running for election as delegates to the state's con-stitutional convention. The Court held that the clergy disqualification provision unconstitutionally conditioned access to the ballot on the minister-candidate's willingness to surrender his religiously-impelled ministry. 435 U.S. at 626, 98 S.Ct. 1322 (plurality opinion); *id.* at 633, 98 S.Ct. at 1329 (concurring opinion).

However, the doctrine has never been restricted to cases where First Amendment interests were implicated. Its origins lie elsewhere, *see, e. g., Frost, supra*, and the doctrine has consistently been employed to protect other constitutional interests. For example, in *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), the court held that due process requires notice and some opportunity for a hearing before students at a tax-supported college are expelled for misconduct. Rejecting appellants' argument that the students had waived notice and a hearing by accepting the privilege of state college enrollment, the court of appeals commented that "the State cannot condition the granting of even a privilege upon the renunciation of the constitutional right to procedural due process." 294 F.2d at 156. In *Parrish v. Civil Service Commission*, 66 Cal.2d 260, 57 Cal.Rptr. 623, 425 P.2d 223 (1967), the California Supreme Court adopted unconstitutional conditions analysis to protect the Fourth Amendment right of welfare recipients to be free from unreasonable warrantless searches of their homes. In that case, the plaintiff was a social worker who had been fired for refusing to participate in warrantless searches of recipients' homes on the grounds that the searches were unconstitutional. The searchers would not force their way into a home if the recipient refused to consent to their entry, but refusal to consent was treated by the welfare agency as grounds for the termination of benefits. The Court held that even if the recipients gave their voluntary consent to the searches, the program of

---

**17.** "[I]t seems to be settled, at least in the First Amendment area, that 'the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . ." ' " *Frissell v. Rizzo, supra*, 597 F.2d at 845.

warrantless searches was unconstitutional because the agency could not condition continued receipt of welfare benefits upon a waiver of Fourth Amendment rights. 57 Cal.Rptr. at 630–31, 425 P.2d at 230–31.

While the doctrine of unconstitutional conditions has not previously been applied to protect the Eighth Amendment interests of a convicted prisoner, we can discern no reason of logic or of policy for declining to do so. In *Lamb v. Hutto*, 467 F.Supp. 562, 565 (E.D.Va.1979), the principle was invoked to safeguard the First Amendment rights of a prison inmate. Most importantly, the logical foundation of the unconstitutional conditions doctrine applies with equal force in any case in which the enjoyment of a government-sponsored benefit is conditioned upon a person's nonassertion of any constitutional right. *See* Van Alstyne, *supra*, 81 Harv.L.Rev. at 1446.

We do note one difference between application of the doctrine here and application in other contexts. The pertinence of the unconstitutional conditions doctrine here depends upon our prior factual finding that the plaintiff is objectively in danger of violent assault. This logical dependency is a consequence of the special nature of the Eighth Amendment right to protection from other inmates. The constitutional rights of freedom of speech, free exercise of religion, and freedom from unreasonable warrantless searches are guaranteed to all person at all times, although of course the contours of the rights may vary from situation to situation. Governmental authorities are always under an obligation to refrain from any activity that would infringe these rights. In contrast, the Eighth Amendment right to protection from other inmates does not place any obligation upon prison authorities except when the objective possibility of assault exists. Therefore, the right is not implicated when the government denies benefits to a prisoner unless the prisoner is actually in danger. In a legal action brought by a prisoner, the burden of showing that he is objectively in danger is of course on the plaintiff.

In this respect, the Eighth Amendment right is like the procedural due process right in *Dixon, supra*, since procedural due process does not place any obligation on governmental authorities unless a person is deprived of a cognizable liberty or property interest. *See, e. g., Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Like procedural due process, the right to protection from other inmates only comes into play in a specific factual context. In the case of procedural due process, the requisite fact is the pending deprivation of a liberty or a property interest; in the case of the right to protection, the requisite fact is that an inmate is objectively in danger of violent assault. We have previously found that the present plaintiff is objectively in danger of violence directed at him by other inmates, thus triggering the unconstitutional conditions doctrine.

■■■■■■■ With the foregoing caveat, we hold that prison authorities may not condition the rights, privileges, or opportunities of a prisoner who is objectively in danger of violent assault upon his renunciation of his Eighth Amendment right to be protected reasonably from violence directed at him by other inmates, except to the extent the *Wolfish* grounded security considerations allow. Here the defendants have confined plaintiff to the BAU for his own protection, and as a condition of this protection, to which plaintiff is constitutionally entitled, have required him to forego education and other benefits. For the reasons and subject to the limitations stated in the preceding discussion, defendants may not deny plaintiff those benefits on a basis that infringes his Eighth Amendment right to protection. We turn then to the questions of security considerations.

### 3. Security Considerations

Given the overriding character of *Bell v. Wolfish*, we must defer to the judgments of prison authorities concerning security considerations unless their response is exaggerated. Since the defendants have advanced different security justifications for each of the various disparities between plaintiff's

privileges and those of prisoners in the general population, we examine the offered justifications separately and in turn. .

a. Educational Programs

The security considerations that are relevant to restrictions on plaintiff's access to educational programs in the main prison building are the burden on the guard force which would be created by supplying plaintiff the necessary two-guard escort, and the diminution in BAU building security arising from the frequent transport of plaintiff to the prison school. *See* pp. 1297–1298, *supra.* For these reasons, we hold that plaintiff is not entitled to attend classes in the main prison building, but must be permitted instruction by tutors and the use of educational materials in his cell.

b. Cell Furniture

The denial to plaintiff of a chair in his cell is plainly an exaggerated response to security considerations which are relevant only to prisoners who are housed in the BAU for reasons other than self-protection. As has already been noted, the only justification asserted by the defendants is that a chair might be dismantled and used as a weapon. However, they have not tried to show that plaintiff himself presents a security risk, and in fact they provided him with a sledgehammer and other heavy tools for use in his former employment within BAU.

c. Visitation, Personal Hygiene, and Time Out the Cell

 With respect to visitation, we find that the disparity between plaintiff's privileges and those of prisoners in the general population is insubstantial. Plaintiff is allowed the same number of visits as other prisoners, but is allowed fewer hours during which visits may be scheduled. The scheduling of visits is within prison officials' discretion. *Pell v. Procunier*, 417 U.S. 817, 92 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Further-

more, defendants have shown that extending the hours for visitation would tax the guard force, and thus have shown a security justification for the limited hours of visitation.

Conflicting evidence was presented on the question of how many guards are required to take plaintiff to the shower. No evidence was presented on the question of possible burdens on the guard force that would result from permitting plaintiff to remain out of his cell for more than one hour per day. With respect to neither of these matters can we conclude that plaintiff has met his burden of proof by showing that the response of prison officials to security concerns was exaggerated. Accordingly, plaintiff's claims for relief related to these issues are denied.

An appropriate order follows.[18]

---

18. Our order is directed at Superintendent Cuyler alone because he possesses the authority to implement it and because an order directed at all twenty-one defendants would be gratu- itous as well as overbroad. Indeed no evidence was presented at trial against most of the other defendants and we have no way of knowing what relief, if any, to require from them. .